# WOODWARD *v.* DE GRAFFENRIED.

## ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 164.  Submitted February 25, 1915.—Decided June 14, 1915.

In an action to determine by what law the beneficiaries of a Creek allotment are to be determined where the allotment was selected by a Creek citizen and made by the Dawes Commission under § 11 of the Curtis Act of June 28, 1898, followed first by the death of the allottee after receiving the allotment and prior to the Original Creek Agreement and then by action of the Commission, after ratification of that agreement, awarding the land to the heirs of the deceased allottee, and the ultimate issue of a patent to them, *held* after reviewing the history of the legislation of Congress in regard to distribution of Creek lands, that:

The only lawful authority possessed by the Dawes Commission to allot Creek lands prior to the adoption of the Original Creek Agreement was derived from the Curtis Act.

Under § 11 of the Curtis Act, allottees took no assignable or inheritable interest in the land or anything more than an exclusive right to possess and enjoy the surface of the land during the lifetime of the occupant.

Decisions of the state court regarding descent of property, the earliest of which was made within three years and after the present action was commenced, cannot be regarded as a rule of property; but, while giving those decisions full weight, this court must examine the questions involved upon their merits.

The rule that reports of the committee having the matter specially in charge, so far as they antedate the statute, may be resorted to as aid to interpretation, applies especially in construing the Curtis Act, to the reports of the Dawes Commission as that Commission was in a real sense "the eyes and the ears" of Congress pertaining to Indian Territory and the legislation was framed with special regard to its recommendations.

Under the Original Creek Agreement, allotments made prior thereto under the Curtis Act, if not inconsistent therewith, were to be treated as if made after the ratification thereof including designation of beneficiaries in case of the death of the allottee.

Under the Original Creek Agreement the allotments of those who had selected lots and received allotments under the Curtis Act

and had died before the ratification of the agreement descended according to the Creek Laws and not according to the laws of Arkansas.

The equitable title to an allotment made under the Curtis Act to a Creek female citizen who died before the ratification of the Original Creek Agreement vested in her heirs under § 28 of the Agreement; and, if not within excepted classes, was confirmed by § 6 of the agreement to her heirs to be determined by the Creek laws of descent.

Under the laws of the Creek Indians the husband whether citizen or not took a half interest in his wife's property 'if she died without children.

The restrictions upon alienation contained in the Original Creek Agreement did not apply to allotments made on behalf of deceased members of the tribe. *Skelton* v. *Dill*, 233 U. S. 206.

A partition suit which is dismissed because the plaintiff could not maintain it against defendants who held adversely, without first establishing title in an action in equity is not *res judicata* that the plaintiff has no interest in the property and a bar to an action in ejectment by plaintiff against the same defendants.

36 Oklahoma, 81, affirmed.

THE facts, which involve the construction and application of the Curtis Act and the Original Creek Agreement and the disposition of an allotment made by the Dawes Commission to the heirs of a Creek Indian after the death of the allottee, are stated in the opinion.

*Mr. William R. Lawrence, Mr. F. W. Clements* and *Mr. Geo. S. Ramsey* for plaintiffs in error.

*Mr. Joseph C. Stone, Mr. Thomas H. Owen* and *Mr. Charles A. Cook* for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was an ejectment suit, brought by defendant in error in the District Court of Muskogee County, Oklahoma, to recover an undivided half interest in a tract of 160 acres of land situate in that county, formerly part of the domain of the Creek Nation in the Indian Territory. The tract was allotted to Agnes Hawes, a Creek Freed-

woman, who, after receiving the allotment, died without issue, leaving surviving her husband, Ratus Hawes (under whom defendant in error claims), her mother, Peggie Woodward, one of the plaintiffs in error, and her father, Louis Woodward, since deceased, to whose rights the remaining plaintiffs in error have succeeded. From an agreed statement of facts it appears that Agnes Hawes was a recognized citizen of the Creek Nation, she being a negress of full blood and enrolled on the Freedmen Roll of that Nation; that she died June 29, 1900, having previously made selection of the tract in question as her allotment of land in that Nation before the Commission to the Five Civilized Tribes and received from the Commission a certificate of allotment therefor; that after her death, and after the adoption of the Original Creek Agreement (Act of March 1, 1901, c. 676, 31 Stat. 861; effective May 25, 1901, 32 Stat. 1971), the Commission awarded the same land to her heirs, and thereafter, on April 1, 1904, a patent for it was duly issued to the "Heirs of Agnes Hawes," without naming them, which patent was in due form and approved by the Secretary of the Interior; that the patent, having been properly recorded, was accepted by her heirs; that at her death Agnes was the legal and acknowledged wife of Ratus Hawes, a non-citizen; that she left no children or grandchildren surviving her, had no children by her said husband, and was survived by him and by her parents already mentioned; and that on June 22, 1904, Ratus Hawes conveyed to plaintiff (defendant in error) an undivided half interest in the lands in question, by deed duly acknowledged and recorded in the records at Muskogee.

There was a judgment for the plaintiff, which was affirmed by the Supreme Court of Oklahoma (36 Oklahoma, 81), and the present writ of error was allowed.

A brief additional recital should preface a statement of the questions in controversy. The date of the selection

by Agnes Hawes and of the allotment to her of the tract in question is not mentioned in the record; but it must have been on or after April 1, 1899, that being the date on which the allotment office for the Creek Nation was opened at Muskogee by the Commission to the Five Civilized Tribes, as appears from their Sixth Annual Report, p. 18, referred to in the marginal note, *infra*. Therefore, both the allotment and the death of the allottee occurred within the period during which § 11 of the Curtis Act (Act of June 28, 1898, c. 517, 30 Stat. 495, 497), was in force in the Creek Nation, by the terms of which the Commission was directed, upon the completion of the citizenship roll and the survey of the lands of the tribe, to "proceed to allot the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment among the citizens thereof, as shown by said roll, giving to each, so far as possible, his fa.. and equal share thereof, considering the nature and fertility of the soil, location, and value of same," with reservations that need not at the moment be specified.

From the facts stated it is also evident that the allotment to Agnes Hawes was made under and by virtue of this section, and therefore comes within the category of allotments confirmed by the Original Creek Agreement (Act of March 1, 1901, c. 676, § 6, 31 Stat. 861, 863).

For we lay on one side, as quite untenable, the contention of defendant in error that the allotment was made not under the Curtis Act but under the Creek Agreement of February 1, 1899, which failed to become law. The principal ground of the contention is that conditions precedent to allotment, prescribed in terms or necessarily implied from § 11 of the Curtis Act, had not been performed in the Creek Nation: the rolls of citizenship not having been completed, no appraisement or classification of the lands having been made for determining what lands were susceptible of allotment and for equalizing the value of allot-

ments, no selections having been approved by the Secretary of the Interior, etc. Not to mention other answers that might be made to this, it is sufficient for the present to say that the only lawful authority to allot Creek lands possessed by the Commission prior to the adoption of the Original Creek Agreement, was derived from the Curtis Act, and that all allotments made during the intervening period were made under instructions issued by the Secretary of the Interior with express reference to the latter act. This will be more particularly shown when we come to discuss, as we must, the proper construction of the two Acts referred to, and their effect upon the title to the allotted tract. The fact that conditions precedent imposed by the Curtis Act had not been performed when the Commission proceeded to make Creek allotments after its passage and prior to the Original Creek Agreement may have furnished one of the reasons for the express ratification of such allotments contained in § 6 of the Agreement; but this, of course, is far from saying that the allotments were not made under the Curtis Act.

The case presented, therefore, is that of a Creek allotment selected by the citizen and made by the Dawes Commission under § 11 of that Act, followed first by the death of the allottee after receiving the allotment and prior to the Original Creek Agreement, and then by action of the Commission, after ratification of that Agreement, awarding the lands to the "heirs" of the deceased allottee, and the ultimate issue of a patent to them.

The principal question is: By what law are the beneficiaries of the allotment and patent to be determined? Plaintiffs in error contend that, by the terms of § 11 of the Curtis Act, Agnes Hawes took an estate of inheritance, subject to the reservation of the minerals; that at her death this interest descended to her heirs, according to the Arkansas laws of descent, under which the husband was not an heir, and acquired no interest in the land by the

curtesy, there being no child born of the marriage; and that § 6 of the Original Creek Agreement in ratifying the allotment vested an absolute title in her heirs, which related back to the date of the allotment or else to the date of her death, and carried the minerals with it. It is the contention of defendant in error, sustained by the Oklahoma courts, that the allotment to Agnes Hawes under the Curtis Act did not vest in her the fee or any heritable interest; that the (equitable) fee was first vested in her "heirs" by the provisions of the Original Creek Agreement, they taking by purchase and not by descent; and that who should take as her "heirs" must be determined according to the Creek laws of descent, under which the surviving husband took an undivided half interest, which passed by his deed to defendant in error.

It is not open to question that at the death of Agnes Hawes (June 29, 1900) the Arkansas law of descent was in force in the Creek Nation. This court, in a recent decision, pointed out the successive acts of legislation, culminating in §§ 26 and 28 of the Curtis Act itself, by which Congress had displaced the tribal laws of descent and distribution and substituted the Arkansas law as expressed in Chapter 49 of Mansfield's Digest. *Washington* v. *Miller,* 235 U. S. 422, 424. But, as shown in that case (p. 425), the Original Creek Agreement contained provisions which reinstated the Creek laws of descent and distribution for certain purposes affecting the allotments in that Nation. Whether they apply to the present case is a subordinate question, to be discussed in its order.

In order to determine the questions thus presented it is necessary first to ascertain the true meaning of § 11 of the Curtis Act, and then to consider the pertinent provisions of the Original Creek Agreement.

In *Barnett* v. *Way* (1911), 29 Oklahoma, 780, a case precisely in point with the present—the allotment having been made under § 11 of the Curtis Act and the allottee

having died thereafter and before the ratification of the Original Creek Agreement—the Supreme Court of Oklahoma held the rule of descent and distribution obtaining at the death of the allottee to be immaterial because she had no title in fee, legal or equitable, that could descend; and further held that by § 6 of the Original Agreement her allotment was ratified, and by § 28 was vested in her heirs, to be ascertained as of the date of her death according to the rule of descent and distribution then in force in the Creek Nation governing the devolution of property owned by any of its deceased members at the time of the member's death. To the same effect is *Divine* v. *Harmon*, 30 Oklahoma, 820. These decisions are invoked by defendant in error as establishing a rule of property. But, as the first of them was rendered only a little more than three years ago, after the present action was commenced and less than a year before it was decided by the Supreme Court of Oklahoma, it seems proper that, while giving due weight to the state decisions, we should reëxamine the questions upon their merits.

Upon a first attentive reading of the Curtis Act (c. 517, 30 Stat. 495) it is seen to be divisible into three principal parts: (a) the first 28 sections, which contain obligatory provisions applicable (with minor exceptions not important in this discussion) generally throughout the Indian Territory, which at that time (Act of May 2, 1890, c. 182, § 29, 26 Stat. 81, 93) included the country of the Five Civilized Tribes, and little besides; (b) § 29, which ratified an agreement made by the Dawes Commission with commissions representing the Choctaw and Chickasaw tribes on April 23, 1897 (the "Atoka Agreement"), as amended, the same to be of full force and effect if ratified before December 1, 1898, by a majority of the votes cast by the members of the tribes at an election held for that purpose; "and if said agreement as amended be so ratified, the provisions of this Act shall

then only apply to said tribes where the same do not conflict with the provisions of said agreement," and (c) § 30, ratifying and resubmitting, on similar terms and with like effect, an agreement made by the Dawes Commission with a commission representing the Creek tribe on September 27, 1897, as amended.

The first part of the Act required (§ 11) the allotment, *without the consent of the tribe,* of "the exclusive use and occupancy of the surface" of all tribal lands susceptible of allotment, reserving to the tribe all oil, coal, asphalt, and mineral deposits, and all town sites; the oil and other minerals to be leased (§ 13) by the Secretary of the Interior; the town lots to be sold (§ 15), with right of preemption to the owner of the substantial improvements, if any, and the purchase money to become the property of the tribe *upon the execution and delivery to the purchaser, by some person authorized by the tribe, of a deed* conveying to him the title to the lands. Each of the proposed agreements contains provisions for the allotment of lands to the members of the tribes, to be followed by the delivery of a *patent conveying all the right, title and interest of the tribe,* excepting, in the case of the Atoka Agreement, the coal and asphalt under the land. With respect to allotments to be made under § 11, *no provision is made for extinguishing the tribal title.* But there is a proviso (p. 498): "That the lands allotted shall be nontransferable until after full title is acquired, and shall be liable for no obligations contracted prior thereto by the allottee, and shall be nontaxable while so held." By § 12, the allotments were to be reported to the Secretary of the Interior, "and *when he shall confirm such allotments* the allottees shall remain in peaceable and undisturbed possession thereof, subject to the provisions of this Act."

Considering the language of § 11, and the absence of provision for extinguishing the tribal title to allotted lands, in contrast with the provisions respecting title

contained in § 15 as to town lots, and those contained in
each of the proposed agreements as to both allotments
and town lots, it seems sufficiently plain, upon the face
of the Act, that allottees under § 11 were to take only
"the exclusive use and occupancy of the surface," with
the right to remain in peaceable and undisturbed posses-
sion, but without right to transfer the allotment until full
title should be acquired.  For the acquisition of such title,
no provision was made by this Act, except as either or
both of the proposed Agreements might be ratified by
the tribes concerned.  There was, however, in § 15 of
an Act of March 3, 1893, c. 209, 27 Stat. 612, 645, a
grant of authority to each of the tribes to allot their
lands in severalty, not exceeding 160 acres to any one
person.

Having regard, therefore, merely to the language em-
ployed in § 11 of the Curtis Act and the context, there is no
foundation for the contention that allottees thereunder
took any assignable or inheritable interest in the land, or
anything more than an exclusive right to possess and enjoy
the surface of the land during the lifetime of the occupant.

It is, however, insisted by plaintiffs in error that when
the conditions existing at the time of the passage of this
Act, and the objects Congress sought to attain by it, are
fully understood and considered, § 11 bears a different
import, and by its true construction confers upon the
allottee at least an equitable title of inheritance in the
lands set apart to him, saving the minerals.  It is said
that to confer upon the allottee a mere right of occupancy
for life, to revert to the tribe and become a part of the
public domain upon his decease, would have given to the
Creek Indians less than they already had under their
own laws, which conferred the right to inclose and cul-
tivate lands of the tribe and to pass the improvements to
their heirs at their death.  It is insisted that at least the
Curtis Act allottee took an inheritable right of occupancy,

and that this, coupled with the confirmation arising from § 6 of the Original Agreement, vested the fee in the heirs of the allottee as of the time of his or her decease, even though that event occurred before the ratification of the Agreement.

It is very true that this Act, passed as it was during a period of transition in the history of the Indian Territory, must be interpreted in the light of the situation then existing, and that we should have especial regard to the "old law" and the "mischief" in order to correctly appreciate the "remedy." And, in view of the great importance of the question before us—for it appears that much the greater part of the Creek lands were allotted during the period intervening between April 1, 1899, and May 25, 1901,—we have resorted to all authentic sources of information within reach in order to realize and appreciate the situation that presented itself to Congress when the Curtis Act was passed. The result is that the view above expressed respecting the true intent and meaning of § 11 is most fully confirmed.

The history of the removal of the Muskogee or Creek Nation from their original homes to lands purchased and set apart for them by the Government of the United States in the territory west of the Mississippi River, does not differ greatly from that of the others of the Five Civilized Tribes rehearsed in recent decisions of this court. *Mullen* v. *United States*, 224 U. S. 448; *Goat* v. *United States*, 224 U. S. 458, 461. Pursuant to treaty provisions (Treaty of 1826, Art. 6, 7 Stat. 286; Treaty of 1832, Arts. 12 and 14, 7 Stat. 366; Treaty of 1833, Art. 3, 7 Stat. 417), the Creeks held their lands under letters patent issued by the President of the United States dated August 11, 1852, vesting title in them as a tribe, to continue so long as they should exist as a nation and continue to occupy the country thereby assigned to them. McKellop's Comp. 1893, p. 9. These treaties and the

Treaty of 1856, 11 Stat. 699, Articles 4 and 15, conferred in ample terms the right of self-government so far as compatible with the Constitution of the United States and the laws made in pursuance thereof regulating trade and intercourse with the Indian tribes. The other four tribes held similar patents.

In the course of time, changing conditions and the great influx of white people into the Territory pointed to the necessity of abolishing, if possible, the tribal organizations, and allotting the land in severalty. But because of the special rights that had been conferred upon these tribes, and the fact that they held patents for their respective lands, it was considered proper, if not indispensable, to obtain the consent of the Indians to the overthrow of the communal system of land ownership. As early as the year 1866, shortly after the close of the Civil War, when new treaties were negotiated with the Five Civilized Tribes (14 Stat. 755, 769, 785, 799), the treaty with the Choctaws and Chickasaws (pp. 774–778) contained provisions for a survey, division, and allotment of their lands, so as to change the tenure from a holding in common to a holding in severalty, in tracts of a quarter-section each; but this plan was made contingent upon the consent of the Choctaw and Chickasaw people through their respective legislative councils. The Chickasaw Council, by an act approved November 9, 1866 (reënacted October 17, 1876), not only confirmed the treaty but gave assent to the adoption of the proposed plan of allotment. The Choctaw Council, by an act approved December 21, 1866, referred the proposition " to the people at large to be declared through their legal representatives in council at the October session, A. D. 1867;" but no affirmative action appears to have been taken upon it. And so the provisions of the treaty in this respect were not put into effect.

When Congress in the act of February 8, 1887, ch. 119,

24 Stat. 388, entered upon the general policy of allotting lands in severalty to the Indians upon the various reservations, the lands of the Creeks and other Indians in the Indian Territory were by § 8 excluded from the operation of the Act.

By § 15 of the Indian Appropriation Act of March 3, 1893, c. 209, 27 Stat. 612, 645, Congress sought to encourage the Five Civilized Tribes to themselves enter upon the policy of allotting their lands in severalty, by giving the express consent of the United States to such allotments, not exceeding 160 acres to any one individual, declaring that the allottees should be deemed to be citizens of the United States and that the reversionary interest of the United States in the allotted lands should cease, and appropriating money to pay for the survey of any lands so allotted. As a declaration of the policy of the United States this section has importance. But it seems to have had no direct effect in the way of establishing that policy; at least, we have found nothing to show that any of the tribes allotted any of their land pursuant to it.

By § 16 of the same Act provision was made for the appointment of a commission to enter into negotiations with the same tribes for the purpose of extinguishing the tribal titles, either by cession to the United States or by allotment and division in severalty among the Indians, or by such other method as might be agreed upon between the several tribes and the United States, with a view to the ultimate creation of a State or States of the Union to embrace the lands within the Territory. This was the origin of the Commission to the Five Civilized Tribes, familiarly known as the Dawes Commission. Its reports, issued annually thereafter, and communicated by the Secretary of the Interior to Congress for its information and guidance, gave a complete and interesting history of the efforts made to further the policy of Congress—efforts

beginning in discouragement but finally crowned with
success.  So far as these reports antedate the legislation
that is under inquiry, they may of course be resorted to as
aids to interpretation, for the Commission was in a very
real sense "the eyes and the ears" of Congress in matters
pertaining to affairs in the Indian Territory, and legislation
was framed with a special regard to its recommendations.
(See *Holy Trinity Church* v. *United States,* 143 U. S. 457,
465; *Binns* v. *United States,* 194 U. S. 486, 495.)  We
append, in the margin a reference-list of these reports.[1]

The 1st Report contains a general explanation of condi-
tions in the Territory, indicating (p. lxviii) the complete

---

[1] REFERENCE LIST OF ANNUAL REPORTS OF THE COMMISSION TO THE
FIVE CIVILIZED TRIBES, transmitted to Congress in connection with
the reports of the Secretary of the Interior, and printed as House
Documents.

1st Report, Nov. 20, 1894, House Ex. Doc., Part 5, 53d Cong.,
     3d Sess., Vol. 14, pp. lix–lxx.
2d Report, Nov. 14, 1895, House Doc. No. 5, 54th Cong., 1st Sess.,
     Vol. 14, pp. lxxix–xcvii.
3d Report, Nov. 28, 1896, House Doc. No. 5, 54th Cong., 2d Sess.,
     Vol. 12, pp. cl–clv.
4th Report, Oct. 11, 1897, House Doc. No. 5, 55th Cong., 2d Sess.,
     Vol. 12, pp. cxvii–cxl.
5th Report, Oct. 3, 1898, House Doc. No. 5, 55th Cong., 3d Sess.,
     Vol. 15, pp. 1051–1090.
6th Report, Sept. 1, 1899, House Doc. No. 5, 56th Cong., 1st Sess.,
     Vol. 19, pp. 3–178.
7th Report, Sept. 1, 1900, House Doc. No. 5, 56th Cong., 2d Sess.,
     Vol. 28, pp. 5–79.
8th Report, Oct. 1, 1901, House Doc. No. 5, 57th Cong., 1st Sess.,
     Vol. 24, pp. 5–221.
9th Report, July 20, 1902, House Doc. No. 5, 57th Cong., 2d Sess.,
     Vol. 18, pp. 180–217.
10th Report, Sept. 30, 1903, House Doc. No. 5, 58th Cong., 2d Sess.,
     Vol. 20, pp. 1–190.
11th Report, Oct. 15, 1904, House Doc. No. 5, 58th Cong., 3d Sess.,
     Vol. 20, pp. 1–198.
12th Report, June 30, 1905, House Doc. No. 5, 59th Cong., 1st Sess.,
     Vol. 19, pp. 579–640.

failure of the tribal governments, and showing that the principle of the treaties, which was that the lands of the several nations should be held in common for the equal benefit of the citizens, was so far departed from in practice that a few energetic men had been enabled to appropriate to their exclusive use almost the entire property of the Territory that could be rendered profitable and available. "In one of these tribes, whose whole territory consists of but 3,040,000 acres of land, within the last few years laws have been enacted under the operation of which 61 citizens have appropriated to themselves and are now holding for pasturage and cultivation 1,237,000 acres. This comprises the arable and greater part of the valuable grazing lands belonging to that tribe. . . . In another of these tribes, under similar legislation, vast and rich deposits of coal of incalculable value have been appropriated by the few, to the exclusion of the rest of the tribe and to the great profit of those who operate them and appropriate their products to their individual use." It was further pointed out that towns of considerable importance, with permanent improvements of great value, had been built upon lands which could not be granted in severalty to the inhabitants. In the 2d Report, pp. lxxxvii, xciii, the substance of the above statements was reiterated with emphasis. And in the 4th Report, dated October 11, 1897, and submitted to Congress shortly before the consideration of the Curtis Bill, reference was made to the pending agreements with the Choctaws and Chickasaws, and with the Creeks (these were rejected by the Indians before the Curtis Bill was passed), and attention was again called (p. cxxi) to "the condition to which these Five Tribes have been brought by their wide departure in the administration of the governments which the United States committed to their own hands, and in the uses to which they have put the vast tribal wealth with which they were intrusted for the common enjoyment of all their peo-

ple. . . . Longer service among them and greater
familiarity with their condition have left nothing to
modify either of fact or conclusion in former reports, but
on the contrary have strengthened convictions that there
can be no cure of the evils engendered by the perversion of
these great trusts but their resumption by the Government
which created them." From these reports it also appears
that while there was a strong sentiment among the Indian
natives favorable to the subdivision of the tribal lands into
individual holdings, the principal chiefs and most influen-
tial citizens were at first opposed to any concession threat-
ening the permanence of the communal or tribal titles.

The first agreement negotiated with the Creeks was
dated September 27, 1897, and in unamended form is
found in the 4th Report, p. cxxix. It provided that every
Creek citizen should have an allotment of 160 acres of the
tribal lands, for which he should receive a patent convey-
ing to him the tribal title; that land should be set apart for
religious and educational institutions, for public buildings,
and for cemetery purposes; that the town lots should be
appraised—land and improvements separately—and that
the owners of the improvements might buy the land; and
that the balance of the tribal lands should be appraised and
sold at auction, and the proceeds put into the Treasury of
the United States and used for the purpose of equalizing
the allotments with respect to value. The Commission
say in their 5th Report, dated October 3, 1898 (p. 1052),
that this agreement "was rejected by the [Creek] council,
the Chief, Isparhecher, some of his friends and other
persons interested in leases obtained from the nation, op-
posing the changes contemplated in it." This rejection
was prior to the passage of the Curtis Act.

Even before the first report of the Commission, the
attention of the Senate of the United States was especially
drawn to affairs in the Indian Territory, and a select com-
mittee was sent there to make an investigation. They

reported under date May 7, 1894, expressing views closely agreeing with those afterwards expressed by the Dawes Commission. And the House Committee report that accompanied the Curtis Bill was to the same effect in substance.

We have set forth in the margin extracts from (a) the Senate Committee report just mentioned, (b) the House Committee report, and (c) the Bill as enacted into law, the latter selected to show how its provisions were directed to the mischiefs pointed out in the reports. The italics are ours.[1]

---

[1] EXTRACTS FROM SENATE COMMITTEE REPORT No. 377, May 7, 1894, 53d CONG., 2d SESS., VOL. 5.

"The theory of the Government was when it made title to the lands in the Indian Territory to the Indian tribes as bodies politic that the title was held for all of the Indians of such tribe. *All were to be the equal participators in the benefits to be derived from such holding. But we find in practice such is not the case.* A few enterprising citizens of the tribe, frequently not Indians by blood but by intermarriage, have in fact become the practical owners of the best and greatest part of these lands, while the title still remains in the tribe—theoretically for all, yet in fact the great body of the tribe derives no more benefit from their title than the neighbors in Kánsas, Arkansas, or Missouri. According to Indian law (doubtless the work of the most of the enterprising class we have named) an Indian citizen may appropriate any of the unoccupied public domain that he chooses to cultivate. In practice he does not cultivate it, but secures a white man to do so, who takes the land on lease of the Indian for one or more years according to the provision of the law of the tribe where taken. The white man breaks the ground, fences it, builds on it, and occupies it as the tenant of the Indian and pays rental either in part of the crop or in cash, as he may agree with his landlord. Instances came to our notice of Indians who had as high as 100 tenants, and we heard of one case where it was said the Indian citizen, a citizen by marriage, had 400 holdings, amounting to about 20,000 acres of farm land. We believe that may be an exceptional case, but *that individual Indians have large numbers of tenants on land not subdued and put into cultivation by the Indian, but by his white tenant, and that these holdings are not for the benefit of the whole people but of the few enterprising ones, is admitted by all.* The

The Curtis bill, as introduced in the House, did not contain the provisions of the present §§ 29 and 30 (30 Stat. 505, 514), ratifying, with amendments, and sub-

monopoly is so great that in the most wealthy and progressive tribe your Committee were told that 100 persons had appropriated fully one-half of the best land. This class of citizens take the very best agricultural lands and leave the poorer land to the less enterprising citizens, who in many instances farm only a few acres in the districts farthest removed from the railroads and the civilized centers. As we have said, *the title to these lands is held by the tribe in trust for the people. We have shown that this trust is not being properly executed, nor will it be if left to the Indians*, and the question arises what is the duty of the Government of the United States with reference to this trust? While we have recognized these tribes as dependent nations, the Government has likewise recognized its guardianship over the Indians and its obligations to protect them in their property and personal rights. . . . We do not care to at this time suggest what, in our judgment, will be the proper step for Congress to take on this matter, for the commission created by an act of Congress, and commonly known as the Dawes Commission, is now in the Indian Territory with the purpose of submitting to the several tribes of that Territory some proposition for the change in the present very unsatisfactory condition of that country. We prefer to wait and see whether this difficult and delicate subject may not be disposed of by an agreement with the several tribes of that Territory. But if the Indians decline to treat with that Commission and decline to consider any change in the present condition of their titles and government the United States must, without their aid and without waiting for their approval, settle this question of the character and condition of their land tenures and establish a government over whites and Indians of that Territory in accordance with the principles of our constitution and laws."

EXTRACTS FROM HOUSE COMMITTEE REPORT, March 1, 1898, accompanying the Curtis Bill, (House Rep. No. 593, 55th Cong., 2d Sess., Vol. 3).

"The Committee on Indian Affairs, to whom was referred the bill (H. R. 8581) for the protection of the citizens of the Indian Territory and for other purposes, respectfully report:

"On account of the importance of the questions involved and the many interests affected by the measure, the question was submitted to a sub-committee of five, who invited a subcommittee of three from

mitting to the approval of the members of the respective tribes, the Atoka agreement and the Creek agreement of September 27, 1897, then recently rejected by the Indians.

the Committee on Indian Affairs in the Senate to join them. The subject was considered by that joint committee for several days and then by the full Committee on Indian Affairs in the House, and after the most careful investigation, your committee recommended the passage of the bill.

"Your committee believes that it has, by this bill, provided a way by which many of the evils existing in the Indian Territory may be corrected.

    *     \*     \*     \*     \*     \*     \*     \*

*"It appears that the title to lands in the Indian Territory has been conveyed by patent to the tribes, and can not be taken from them without their consent.* There are about 20,000,000 acres of land thus owned. It is rich in mineral deposits, and contains a large area of splendid farming and grazing land. . . .

*"For the last few years the Dawes Commission has been endeavoring to secure agreements with the various tribes, but so far there has been little accomplished.* Agreements were made with the commissioners of the several tribes—all, in fact, except the Cherokees—but the Creek agreement was rejected by the tribe when the vote was taken upon it. . . . *In view of the fact that it is now impossible to secure agreements with the tribes, and the fact that the title is in the tribe, your committee has provided for the allotment of the exclusive use and occupancy of the surface of the lands of each of the nations; but all valuable oil, coal, asphalt, mineral deposits, and town sites are reserved from allotments.*

*"Your committee found that while under treaty provisions the lands of each tribe were to be held for the use and benefit of each of its members, yet the truth is that the lands are in the possession of a very few; and while some of the more powerful members have in their possession and under their control thousands of acres, the poorer class of Indians are unable to secure enough lands for houses and farms; and your committee has provided in this bill for a division of the use of the surface of the lands, so that each and every member of the tribes will be placed in possession of his share of the common lands. We believe this to have been the intent of all parties when the treaty was made.*

"Your committee was convinced that there are many rich deposits of coal and other minerals in said Territory, and that the tribes are not deriving the benefits therefrom that they should derive, but that individual members, and those holding leases from them, are deriving

These were added as a Senate amendment, perhaps at the
suggestion of the Dawes Commission, for it appears from
their 5th Report, p. 1053, that they were in Washington

more than their share of the profit, so it has provided that all valuable
mineral deposits be reserved to the tribes and be set aside as incapable
of allotment, and that such mineral deposits be in the future leased
under rules and regulations prescribed by the Secretary of the In-
terior.   .   .   .

"Your committee fully appreciates the important problems involved,
and it believes this measure, if enacted into law, will do much to settle
those problems.  *It will settle the intruder question, protect the so-called
common Indians by allotting to them their right to use and occupy their
part of the lands; it will break up the monopoly of lands which has reached
enormous proportions in the Territory; it will secure to the tribes the income
from the rich mineral deposits, and prevent that which rightfully belongs
to them from being used by a few individuals;* it will assist in establishing
schools and churches; it authorizes the laying out of cities and towns,
and gives them power to enact and enforce ordinances; it will insure
the people of that country the protection and relief to which they are
entitled, and, at the same time, it protects the interests of the various
tribes."

EXTRACTS FROM CURTIS ACT (c. 517, 30 Stat. 495). .

"SEC. 11. That when the roll of citizenship of any one of said nations
or tribes is fully completed as provided by law, and the survey of the
lands of said nation or tribe is also completed, the commission hereto-
fore appointed under Acts of Congress, and known as the 'Dawes
Commission,' *shall proceed to allot the exclusive use and occupancy of
the surface of all the lands of said nation or tribe susceptible of allotment
among the citizens thereof, as shown by said roll, giving to each, so far as
possible, his fair and equal share thereof,* considering the nature and
fertility of the soil, location, and value of same; but all oil, coal, asphalt,
and mineral deposits in the lands of any tribe are reserved to such tribe,
and no allotment of such lands shall carry the title to such oil, coal,
asphalt, or mineral deposits;  .  .  .   When such allotment of the
lands of any tribe has been by them completed, said commission shall
make full report thereof to the Secretary of the Interior for his ap-
proval;  .  .  .   *provided further,* that whenever it shall appear that
any member of a tribe is in possession of lands, his allotment may be
made out of the lands in his possession, including his home, if the
holder so desires.  .  .  .   *Provided further, that the lands allotted shall*

coöperating with Congress respecting this legislation. Section 11, however, in substantially its final form, was a part of the original bill. Sections 16, 17, and 23, also, but in somewhat different form, were in the bill as introduced.

be *nontransferable until after full title is acquired and shall be liable for no obligations contracted prior thereto by the allottee, and shall be non-taxable while so held.*

"Sec. 12. That when report of allotments of lands of any tribe shall be made to the Secretary of the Interior, as hereinbefore provided, he shall make a record thereof, *and when he shall confirm such allotments the allottees shall remain in peaceable and undisturbed possession thereof, subject to the provisions of this Act.*

"Sec. 13. That the Secretary of the Interior is hereby authorized and directed from time to time to provide rules and regulations in regard to the leasing of oil, coal, asphalt, and other minerals in said Territory, and all such leases shall be made by the Secretary of the Interior; and any lease for any such minerals otherwise made shall be absolutely void. . . .

"Sec. 15. That there shall be a commission in each town for each one of the Chickasaw, Choctaw, Creek, and Cherokee tribes. . . . Said commissions shall cause to be surveyed and laid out town sites where towns with a present population of two hundred or more are located, . . . *And all town lots shall be appraised by said commission at their true value, excluding improvements; and separate appraisements shall be made of all improvements thereon;* and no such appraisement shall be effective until approved by the Secretary of the Interior. . . . *The owner of the improvements* upon any town lot, other than fencing, tillage, or temporary buildings, *may deposit in the United States Treasury,* Saint Louis, Missouri, *one-half of such appraised value; . . . and such deposit shall be deemed a tender to the tribe of the purchase money for such lot.* If the owner of such improvements on any lot fails to make deposit of the purchase money as aforesaid, then such lot may be sold in the manner herein provided for the sale of unimproved lots; . . . *All town lots not improved as aforesaid shall belong to the tribe,* and shall be in like manner appraised, and, after approval by the Secretary of the Interior, and due notice, *sold to the highest bidder* at public auction by said commission, but not for less than their appraised value, unless ordered by the Secretary of the Interior; and *purchasers may in like manner make deposits of the purchase money with like effect, as in case of improved lots. . . . The person authorized by the tribe or tribes may execute or deliver to any such*

It is evident that at the time this law was enacted, Congress entertained serious doubts as to its constitutional power to interfere with the tribal lands of the Five Civ-

---

*purchaser, without expense to him, a deed conveying to him the title to such lands or town lots;* and thereafter the purchase money shall become the property of the tribe; and all such moneys shall, when titles to all the lots in the towns belonging to any tribe have been thus perfected, be paid per capita to the members of the tribe. . . .

"SEC. 16. That it shall be *unlawful for any person, after the passage of this Act,* except as hereinafter provided, *to claim, demand, or receive, for his own use* or for the use of anyone else, any royalty on oil, coal, · asphalt, or other mineral, or on any timber or lumber, or any other kind of property whatsoever, or *any rents on any lands or property belonging to any one of said tribes or nations in said Territory,* or for anyone to pay to any individual any such royalty or rents or any consideration therefor whatsoever; . . . *Provided,* That where any citizen shall be in possession of only such amount of agricultural or grazing lands as would be his just and reasonable share of the lands of his nation or tribe and that to which his wife and minor children are entitled, he may continue to use the same or receive the rents thereon until allotment has been made to him. . . .

"SEC. 17. *That it shall be unlawful for any citizen of any one of said tribes to inclose or in any manner, by himself or through another, directly or indirectly, to hold possession of any greater amount of lands or other property belonging to any such nation or tribe than that which would be his approximate share of the lands belonging to such nation or tribe and that of his wife and his minor children as per allotment herein provided;* and any person found in such possession of lands or other property in excess of his share and that of his family, as aforesaid, or having the same in any manner inclosed, at the expiration of nine months after the passage of this Act, shall be deemed guilty of a misdemeanor. . . ·

"SEC. 23. *That all leases of agricultural or grazing land belonging to any tribe made after the first day of January, eighteen hundred and ninety-eight, by the tribe or any member thereof shall be absolutely void,* and all such grazing leases made prior to said date shall terminate on the first day of April, eighteen hundred and ninety-nine, and all such agricultural leases shall terminate on January first, nineteen hundred; *but this shall not prevent individuals from leasing their allotments when made to them as provided in this Act, nor from occupying o· renting their proportionate shares of the tribal lands until the allotments herein provided for are made."*

ilized Tribes or to overthrow the tribal governments without the consent of the Indians. Some of the doubts were afterwards resolved by the decisions rendered by this court in *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 489, 491, and *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307. From what has been said and quoted, however, it very clearly appears that the purpose of Congress in the allotment provisions of § 11, and in those quoted from §§ 16, 17, and 23, which should be read in the same connection, was not to interfere at all with the tribal title to the allotted land unless with the consent of the tribe, manifested either by approval of the Agreement for that purpose submitted, or by tribal action under § 15 of the Act of 1893; that the Curtis Act had for its object the administration of the trusts imposed upon the several tribes by the early treaties, and which the tribes had failed to enforce, namely, that the beneficial use of the tribal domain should be enjoyed equally by all the members of the tribe, and that monopolization of it in any form or by any means should be prevented. Section 15, providing for the sale of town lots, improved or unimproved, went somewhat further, and permitted the purchaser to deposit the purchase price in the United States Treasury by way of tender to the tribe. A clause was included—permissive, but probably not obligatory upon the tribe—that "the person authorized by the tribe or tribes may execute or deliver to any such purchaser, without expense to him, a deed conveying to him the title to such lands or town lots; and thereafter the purchase money shall become the property of the tribe," etc. This plan recognized the fact, referred to in the 1st Report of the Dawes Commission, that towns had been built up with the consent of the tribes, and valuable dwellings and other improvements constructed, without title and without means of acquiring title to the land. With the town lot question we have no present concern, except as § 15, by contrast, throws light upon § 11 and the

other compulsory provisions of the Act respecting allottable lands. Section 11, we repeat, conferred only a personal right to the exclusive use and occupancy of the surface, to be enjoyed by persons identified by the Dawes Commission as properly entitled to a place upon the citizenship rolls.

The argument that this gave to the Creek Indians less than they were already entitled to under their own laws is wide of the mark. We must not be understood as conceding that the Creek laws conferred any inheritable right, except to the improvements upon the land; certainly, no ampler right could be conferred as against the United States, in view of the limitations imposed upon the tribal title by the terms of the patent held by the tribe. But, passing this question, the chief difficulty was not in the Creek laws, but in the mode of their administration or mal-administration. And the manifest purpose of the Curtis Act was not to displace but to recognize the communal titles, and to administer the use of lands for the equal benefit of the members of the tribes according to the true intent and meaning of the early treaties; the effort being to do what the tribal governments ought to have done but were failing to do. That this meaning was placed upon the Act by the Secretary of the Interior will appear from the administrative regulations issued to the Dawes Commission, excerpts from which are set forth in the marginal note, *infra*.

*Goat* v. *United States*, 224 U. S. 458, 469, is not in conflict with the view above expressed. That case dealt with the right of Seminole Freedmen to convey the lands allotted to them in severalty pursuant to the agreement confirmed by the Act of July 1, 1898 (c. 542, 30 Stat. 567), and turned upon the question whether the restriction upon alienation imposed by that agreement had been violated. It was argued that the interest of the allottee was not of such a character as to be susceptible of trans-

fer; and—notwithstanding the provision in the agreement that each allottee should have "the sole right of occupancy of the land so allotted to him"—the court rejected the argument on the ground that the allotments constituted the respective shares of the allottees in the tribal property and were set apart to them as such, and that while the execution of the deeds was deferred, each had meanwhile a complete equitable interest in the land allotted to him. But this was because it was so agreed between the United States and the tribe, and has no bearing upon the proper construction of § 11 of the Curtis Act, which was intended to have effect without consent of the tribe, and was enacted at a time when it was seriously doubted by Congress whether without such consent the tribal title could be divested in favor of an allottee.

In *Welty* v. *Reed*, 219 Fed. Rep. 864, 867, the Circuit Court of Appeals for the Eighth Circuit, in passing upon another question, expressed the view that a Curtis Act allottee had an inheritable estate or interest. This seems to have been based upon a mistaken view of what was decided in *Goat* v. *United States.*

From what we have said it results that, when Agnes Hawes, having received an allotment under the Curtis Act, died in June, 1900, without other interest in the land, her interest died with her, and there was nothing upon which the Arkansas law of descent could operate. This would have been so, even had her allotment received the approval of the Secretary of the Interior under § 12 of the Curtis Act. As will presently appear, however, it must be deemed to have been a mere temporary or provisional allotment, not final even for the purposes of the Curtis Act.

We are next to consider the effect upon such an allotment of the subsequent adoption of the Original Creek Agreement (Act of March 1, 1901, c. 676, 31 Stat. 861). But, first, it will be well to briefly review what had been

done in the meantime under the Curtis Act, in order that we may the better understand the situation with which Congress dealt in 1901.

From the 6th Report of the Dawes Commission, p. 9, it appears that while the Atoka Agreement, as proposed by the Curtis Act, was ratified by the Choctaw and Chickasaw Nations at a special election held August 24, 1898, the amended Creek Agreement of September 27, 1897, was not ratified. "Chief Isparhecher of the Creeks was slow to call an election, and it was not until November 1, 1898, that the agreement with that tribe was submitted in its amended form for ratification. While no active interest was manifested, the full-bloods and many of the freedmen were opposed to the agreement and it failed of ratification by about one hundred and fifty votes. As a result the Act of June 28, 1898, known as the Curtis Act, became effective in that nation."

The same report shows (p. 18) that the Commission found it impracticable to establish allotment offices in all five of the tribes pursuant to the departmental regulations of October 7, 1898 (set forth below, in the margin), until a proper system and method of procedure should have been devised, established in óne tribe, and demonstrated by experience as satisfactory. "The initiatory work being experimental and requiring the close attention of the Commission, such office was established at Muskogee, in the Creek Nation, where the general office of the Commission is located, thus enabling the Commission to better superintend its operations. Due notice was given by publication, as required by the rules of the secretary, and the office opened for the selection of allotments on April 1, 1899." . . . (Page 20): "Up to and including June 30, 1899, three thousand eight hundred selections were filed on in the Creek Nation."

The 7th Report, p: 31, stated that "Up to and including June 30, 1900, there have been 10,000 selections filed

in the Creek Nation, amounting approximately to two-thirds of the total number of citizens, and covering the most thickly settled and improved lands of the nation."

These selections were treated as "preliminary," and the allotments as "temporary." The difficulties to be overcome before complete and final allotment were great and unprecedented. (7th Report, p. 12.) For instance, the Creek citizenship rolls had not been completed at the time of the making of the Agnes Hawes allotment, nor were they, indeed, until some time in the year 1902. It is also to be noted that § 11 of the Curtis Act does not authorize allotments of 160 acres or any other specified area, but contemplates a valuation of the allottable lands so as to give to each citizen his fair and equal share in value. Evidently, the Secretary of the Interior and the Dawes Commission realized that to postpone the beginning of allotments until the roll of citizenship of any tribe should be "fully completed as provided by law"—there being disputes without number respecting questions of citizenship, and a mass of litigation arising out of them, as witness *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 467, which involved 166 appeals from the United States courts in the Indian Territory to this court taken under the Act of July 1, 1898, c. 545, 30 Stat. 571, 591—would have postponed indefinitely the inauguration of the allotment policy in the Indian Territory. The same result would have followed if allotment had been required to await a valuation, lot by lot, of all the allottable lands. But the immediate inauguration of the policy of allotment was urgently called for, not only to break up the system of land monopolies, productive of so much injustice to the individual Indians, but also to educate the Indians in the benefits to be derived from separate occupancy and enjoyment of the land, and thereby to gain popular support for the agreements that

were so earnestly desired as the only permanent relief from an intolerable situation.

There were over 3,000,000 acres of land in the domain of the Creek Nation, and approximately 16,000 Creek Indians and Freedmen. It was easily to be seen that the tribe possessed sufficient allottable land to permit each citizen to take 160 acres, assuming the land values were approximately uniform. There were many reasons of convenience and of sentiment indicating the quarter section as a proper provisional allotment. It ran with the lines of the Government surveys; it was the quantity permitted to be taken up by a citizen of the United States under the preëmption and homestead laws (Rev. Stat., §§ 2259, 2289); it was the quantity proposed to be allotted in the Choctaw-Chickasaw Treaty of 1866, as has been stated; it was the quantity allotted to an Indian, the head of a family, under the general allotment act of 1887 (c. 119, 24 Stat. 388); it was this area that was pointed out as proper to be allotted to an individual citizen of the Five Civilized Tribes by § 15 of the Act of 1893, c. 209, 27 Stat. 645; and, finally, by the amended Creek Agreement of September 27, 1897 (previously rejected by the tribe, but by the Curtis Act required to be resubmitted), 160 acres were to be allotted to each citizen, the residue of allottable lands to be sold in tracts not exceeding that area.

And so it is not surprising that the Secretary of the Interior, in establishing regulations for the selection of allotments under the Curtis Act, included a clause permitting each Creek citizen to take 160 acres. Extracts from these regulations are set forth in the margin.[1] They

---

[1] EXTRACTS FROM RULES AND REGULATIONS PRESCRIBED BY THE SECRETARY OF THE INTERIOR FOR THE SELECTION AND RENTING OF PROSPECTIVE ALLOTMENTS UNDER THE CURTIS ACT. (Sixth Annual Report of Commission, House Doc. No. 5, 56th Cong., 1st Sess.; Vol. 19, p. 81, etc.)

"*It is the intention of this law* [the Curtis law] *to require every member*

contemplated temporary allotments, intended to be approximately equal to what each citizen would get from final allotment.

Meanwhile the Dawes Commission, after the rejection by the Creeks of the agreement submitted pursuant

---

*of any tribe holding in his possession lands in excess of his 'just and reasonable share of the lands of his nation or tribe, and that to which his wife and minor children are entitled,' to relinquish possession thereof in order that other members of the tribe may enter thereon and make homes preparatory to the allotment so contemplated.* . . .

"In order, therefore, to give effect to the provisions of said Act according to its design, and *to enable every member of each tribe to select and to have set apart to him lands to be allotted to him in amount approximating his share,* as aforesaid, the Commission to the Five Civilized Tribes is instructed, as a means preparatory to and in aid of the duty of allotment of the lands of said tribes required of it by said Act, to proceed as early as practicable to establish an office within the territory of each tribe, provided with proper and suitable records, including a copy of the United States survey of the lands of the tribe, for the purpose of registering each and every selection of lands made by any member of the tribe for his allotment; and in order to make such selection of lands by any member of any tribe effective and valid such member, or the head of each family, shall be required to appear in person at the office within his tribe and to make application . . . *and thereafter he may occupy, control, and rent the same for any period not exceeding one year, by any one contract, until lands are in fact allotted to him under terms of said Act, and will be protected therein by the government from interference by all other persons whomsoever.* . . .

"Selections of land may be made by members of the several tribes in quantities not to exceed 160 acres to each Creek, 80 acres to each Cherokee, 240 acres to each Choctaw and each Chickasaw, and 40 acres to each Choctaw and each Chickasaw Freedman.

"And the balance of the lands belonging to each tribe shall be left uninclosed and open for the common use of all members of the tribe until final allotment, and then be divided among them according to the provisions of said Act of Congress and agreement, where agreements have been ratified, so that every member shall have his fair and equal share of all the lands of his tribe.

"After the 1st day of April, 1899, any member of any tribe may enter upon and occupy any lands which have not already been, as

to § 30 of the Curtis Act, negotiated another agreement with them on February 1, 1899, which, although ratified by the tribe on February 18, was rejected by Congress. 6th Report, pp. 10, 59. Still another agreement was negotiated under date of April 8, 1900 (7th Report, pp. 13, 47), which, with some amendments, was ratified by Congress in behalf of the United States by the act of March 1, 1901 (31 Stat. 861). It was subsequently ratified by the Creek Nation on May 25, 1901 (8th Report, pp. 11, 47; 32 Stat. 1971), and is known as the Original Creek Agreement. It provided for a general allotment of all the tribal lands, except town sites, etc., 160 acres being allotted to each citizen; town lots to be sold; deeds or patents to be made to allottees and purchasers, conveying the tribal title; the residue of lands and all funds arising under the agreement to be used for equalizing allotments; and any deficiency to be supplied out of other funds of the tribe, "so that the allotments of all citizens may be made equal in value, as nearly as may be."

The sections especially bearing upon the present inquiry are §§ 6, 7, and 28.[1] These and the other provisions of the

_____

hereinbefore provided, selected and occupied by another member of the tribe, whether such lands be improved or inclosed or not. . . ."

Promulgated October 7, 1898.

AMENDMENTS TO RULES AND REGULATIONS of October 7, 1898, made April 7, 1899.

"Each Creek citizen may select, in manner provided in said rules, 160 acres of land from the Creek domain, and each Cherokee citizen may so select 80 acres from the Cherokee domain; such selections to be from any lands upon which they now own improvements or from any lands not occupied by or in the possession of any other citizen of the tribe to which the applicant belongs. . . ."

_____

[1] EXTRACTS FROM ORIGINAL CREEK AGREEMENT, Act of March 1, 1901 (c. 676, 31 Stat. 861).

"6. All allotments made to Creek citizens by said Commission prior to the ratification of this agreement, as to which there is no contest,

Agreement respecting the allotment of lands show that it was the intention of the parties to accept and confirm the allotment work already performed by the Dawes Commission, with the same effect as if it had been done after the ratification of the agreement. This was to adopt what had been done in dividing the lands so far as it had been done consistently with the provisions of the Agreement, and thus save not only the time and expense of the

---

and which do not include public property, and are not herein otherwise affected, are confirmed, and the same shall, as to appraisement and all things else, be governed by the provisions of this agreement; and said Commission shall continue the work of allotment of Creek lands to citizens of the tribe as heretofore, conforming to provisions herein; and all controversies arising between citizens as to their right to select certain tracts of land shall be determined by said Commission.

"7. Lands allotted to citizens hereunder shall not in any manner whatsoever, or at any time, be incumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the date of the deed to the allottee therefor and such lands shall not be alienable by the allottee or his heirs at any time before the expiration of five years from the ratification of this agreement, except with the approval of the Secretary of the Interior.

"Each citizen shall select from his allotment forty acres of land as a homestead, which shall be nontaxable and inalienable and free from any incumbrance whatever for twenty-one years, for which he shall have a separate deed, conditioned as above.  .  .  .

"The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he have no such issue, then he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done, the land shall descend to his heirs, according to the laws of descent and distribution of the Creek Nation, free from such limitation."

\*      \*      \*      \*      \*      \*      \*      \*

"28. No person, except as herein provided, shall be added to the rolls of citizenship of said tribe after the date of this agreement, and no person whomsoever shall be added to said rolls after the ratification of this agreement.

"All citizens who were living on the first day of April, eighteen hundred and ninety-nine, entitled to be enrolled under section twenty-one

allotment work, but the great confusion and hardship that would necessarily have resulted if the attempt had been made to vacate upwards of 10,000 allotment selections already made, involving the greater part of the improved lands of the Nation and a large majority of the citizens. At the same time the Curtis Act allotments were brought under the provisions of the Agreement respecting the conveyance of the tribal title, etc. We see no evidence of a purpose to put allotments previously made upon a different basis, in any respect, from allotments thereafter to be made; on the contrary, the phrase used in § 6 is that the confirmed allotments "shall, as to appraisement and all things else, be governed by the provisions of this agreement." We construe the section to mean that allotments theretofore made, if not inconsistent with the provisions of the Agreement, were to be treated the same as if made after the ratification of the Agreement; and this includes the designation of the beneficiaries in case of the death of an allottee.

There were reasons for an express ratification of the allotment work previously done by the Commission. As already pointed out, the allotments had been tentatively and provisionally made in tracts of 160 acres, upon the order of the Secretary of the Interior, and without express authorization of acreage allotments in the Curtis Act; they had been made before completion of the membership rolls and without appraisement of the lands; and, of course, they had been made without the consent of the tribe.

_____

of the [Curtis Act] . . . . shall be placed upon the rolls to be made by said Commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly. . . ."

But it is argued by plaintiffs in error that there is no provision of the Agreement that can be construed to apply the Creek law of descent to Curtis Act allotments; that § 28 provides for an allotment to the heirs according to Creek law in two cases only, (a) where a citizen living on April 1, 1899, died *prior* to the ratification of the agreement *"before* receiving his allotment of lands and distributive share," etc.; and (b) where the citizen living April 1, 1899, died *after* the ratification of the agreement *"before* receiving his allotment," etc. It is insisted that Agnes Hawes did not fall within either of these classes, since she died *before* the ratification of the agreement but *after* receiving her allotment. It is also insisted that § 7 put in force the Creek law of descent only with respect to the homestead 40 acres; and since the Curtis Act had no provision for homesteads the allotment, when made, was not impressed with homestead characteristics, and no part of the land allotted to heirs was impressed with such characteristics by the Agreement. The result of this argument, if sound, would be that all Curtis Act allotments (over 10,000 in number, and covering more than 1,600,000 acres; 8th report, p. 32), and all allotments made after the ratification of the Original Agreement except homestead allotments under § 7 and a limited class of allotments under § 28, would descend according to the Arkansas laws of descent, while the exceptional allotments, comparatively of little importance, would descend according to the Creek laws.

Even if this construction accorded with the strict letter of the Agreement, it savors too much of refinement to be accepted as an exposition of the true intent and meaning of an engagement made between the Government of the United States and an Indian tribe. *Jones* v. *Meehan*, 175 U. S. 1, 10; *Choate* v. *Trapp*, 224 U. S. 665, 675. The adoption of the Creek laws of descent was a concession to the Indians, who were of course more familiar with their

own laws than with Chapter 49 of Mansfield's Digest, and were no doubt materially influenced in giving consent to the treaty by the fact that thereafter their lands would descend just as their personal property had descended in former times. To confine the operation of the Creek laws to the few and exceptional cases, and leave the Arkansas laws in effect respecting the greater part of the tribal domain, would be to keep the word of promise to the ear, while breaking it to the hope. At the same time, it would be inconsistent with the purpose expressed in § 6 to put Curtis Act allotments on a parity with allotments afterwards made. The confusion that would result from applying two variant systems of law at one and the same time, with respect to lands lying side by side and otherwise indistinguishable, is of course apparent. The suggested construction must be rejected.

In our opinion the equitable title to the Agnes Hawes allotment was vested in her heirs according to Creek law by the clear meaning of § 28, which says: "All citizens who were living on the first day of April, eighteen hundred and ninety-nine, entitled to be enrolled . . . shall be placed upon the rolls . . . and if any such citizen has died since that time . . . before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled if living shall descend," etc. Although she had been placed in possession of an allotment, she had not in her lifetime "received" it, in the sense of the Agreement, for this contemplated ownership in fee, and she had received only a provisional surface right. Besides, while § 6 in confirming the allotment brought it under those provisions of the Agreement that contemplated a patent in fee, it was still only a partial dividend out of the property of the tribe. There remained something else contemplated by the Agreement and not received by Agnes Hawes in her lifetime, namely, her "distributive share of

all the funds of the tribe." Thus we have the precise situation contemplated by § 28, which in that case confers the lands and money, to which she would have been entitled if living, upon her heirs according to Creek law. This accords with the view adopted by the Oklahoma Supreme Court in *Barnett* v. *Way*, 29 Oklahoma, 780, 785. And see *Washington* v. *Miller*, 235 U. S. 422, 425.

Were there doubt of the correctness of this view, and were § 28 as restricted in its effect as is contended by plaintiff in error, the same result would follow from a fairly liberal reading of § 7, such as would have to be adopted in construing an agreement with Indians. That section begins by saying that "Lands allotted to citizens hereunder" shall not be encumbered or sold to secure or satisfy any debt contracted prior to the date of the deed to the allottee, and shall not be alienable within five years from the ratification of the agreement except with the approval of the Secretary of the Interior. Then follow clauses imposing restrictions solely upon the homestead 40 acres, and the section ends by declaring that the homestead shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of the Agreement, but in the absence of such issue "he may dispose of his homestead by will, free from limitation herein imposed, and if this be not done, *the land shall descend* to his heirs, according to the laws of descent and distribution of the Creek Nation, free from such limitation." It is reasonable to suppose that the Indians, when giving approval to this agreement, would understand that the land which was thus to descend free from limitation included as well the land to which the limitation had never applied as that to which it had applied, but respecting which it had expired. And they would understand the provisions of § 28 (if limited as is here contended) to apply the laws of descent and distribution of the Creek Nation to allotments made under the peculiar circum-

stances there provided for, in order to bring those allotments into conformity, as to descent and otherwise, with allotments of the general class, including allotments made prior to the ratification of the agreement, which by § 6 were "as to appraisement and all things else" to be governed by the provisions of the agreement. Such was the view expressed by the Supreme Court of Oklahoma in *de Graffenried* v. *Iowa Land & Trust Co.* (1907), 20 Oklahoma, 687, 709–711. In *Bartlett* v. *Okla. Oil Co.*, 218 Fed. Rep. 380, 385, the United States District Court for the Eastern District of Oklahoma passed upon the question of the descent of a Creek allotment held by a full-blood Indian of that tribe who died November 17, 1907, one day after the admission of Oklahoma as a State. It being in dispute whether the Creek law, the Arkansas law, or the Oklahoma law of descent and distribution applied, the court, in the course of a historical review of the legislation of Congress, said (p. 385) that under the Original Creek Agreement the descent of surplus lands was not especially provided for, and therefore was controlled by the laws of Arkansas, in force in the Indian Territory by virtue of the Act of June 7, 1897, and June 28, 1898 (the Curtis Act); but this was clearly *obiter*.

Under either of the views that we have expressed, the Agnes Hawes allotment, if it was uncontested, if it did not include public property, and was not otherwise affected by the Original Creek Agreement, was confirmed by § 6. That it was not among the excepted classes is sufficiently evidenced by the subsequent action of the Dawes Commission in awarding it to the heirs of Agnes. That which had been tentative and provisional, then became by force of the provisions of the Agreement, final and conclusive. The result was to vest a complete equitable title in her "heirs," to be determined according to the Creek laws of descent and distribution; and, upon familiar principles, their interest, being vested, was not divested by the sub-

sequent adoption of the Act of May 27, 1902, c. 888, effective July 1, 1902 (32 Stat. 258; Joint Res. No. 24, 32 Stat. 742), or the Supplemental Creek Agreement (Act of June 30, 1902, c. 1323, § 6, 32 Stat. 500, 501; effective August 8, 1902, 32 Stat. 2021), which substituted the Arkansas laws. (See *Ballinger* v. *Frost*, 216 U. S. 240, 249.) *Sizemore* v. *Brady*, 235 U. S. 441, 448, is distinguishable, because there the allotment in question was not selected or made until after the Supplemental Agreement went into effect.

It is undisputed that according to Creek law the husband was entitled to take a half interest in his wife's property if she died without will, at least in case there were no children. And it is now settled that an intermarried non-citizen husband could inherit under the tribal laws the same as if he were a citizen. *Reynolds* v. *Fewell*, 236 U. S. 58, 63; *Shellenbarger* v. *Fewell*, 236 U. S. 68.

It is perhaps unnecessary to say that the subsequent issue of a patent to the "Heirs of Agnes Hawes," without naming them, conveyed the legal title to those persons upon whom the equitable title was conferred by the Original Agreement.

The restrictions upon alienation contained in the Original Agreement did not apply to allotments made on behalf of deceased members of the tribe. *Skelton* v. *Dill*, 235 U. S. 206, 210. Indeed, all restrictions upon alienation as to allottees not of Indian blood (except minors and except as to homesteads) were removed by the Act of April 21, 1904 (c. 1402, 33 Stat. 189, 204).

Therefore, the conveyance on June 22, 1904, by Ratus Hawes to defendant in error passed to the latter the undivided half interest in the lands in question.

The further point is raised that defendant in error (plaintiff below) was barred from maintaining his present action by a decree dismissing a previous suit, brought by him prior to Statehood in the United States Court for

the Western District of the Indian Territory, against
Louis and Peggie Woodward, for a partition of the same
land. This contention—equivalent to the plea of *res
adjudicata*—was rejected by the state court upon the
ground that the partition suit was brought in equity,
and was dismissed because the petition showed that the
land was held by the defendants adversely to plaintiff,
and because he could not maintain an action for partition
in equity without first establishing his title by an action
in ejectment. The decision was rested upon the authority
of numerous cases cited from the Supreme Court of Ar-
kansas—the practice of that State having been put in
force in the Indian Territory by act of Congress. We
concur in the result, and need add nothing to the reason-
ing of the state court.

One or two other questions were argued, but they are not
within the assignments of error—indeed, were not raised
in the court whose judgment is under review.

*Judgment affirmed.*