*JEFFERSON *et al.* v. COOK *et al.*

No. 7453.   Opinion Filed February 8, 1916.

Rehearing Denied March 14, 1916.

(155 Pac. 852.)

1.   INDIANS—Descent and Distribution—Statutes. On June 4, 1908, a duly enrolled Creek freedman died intestate after receiving her allotment, leaving her surviving no issue, nor husband, nor mother, leaving her surviving her father and brothers and sisters, all duly enrolled Creek freedmen. **Held,** that Enabling Act. secs. 13 and 21, and Const. art. 25, sec. 2, in effect repealed that part of section 6 of the Supplemental Agreement (Act Cong. June 30, 1902, c. 1323, 32 Stat. 501) providing that the descent and distribution of land and money provided for by an act of Congress approved March 1, 1901 (31 Stat. 861, c. 676), shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of

Arkansas, and substituted therefor the laws of the Territory of Oklahoma thus extended to and put in force throughout the state, leaving in force the two provisos contained in section 6, which survive and operate as such upon the laws extended to the extent of limiting the same so that "only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation," and "that if there be no person of Creek citizenship to take the descent and distribution of said estate then the inheritance shall go to non-citizen heirs in the order named in" the laws of the State of Oklahoma.

2. **SAME**—Rev. Laws 1910, secs. 8416, 8417, and 8418, construed, and **held** that, as intestate left no issue, nor husband nor mother, the father takes the estate to the exclusion of the brothers and sisters, and that the seventh subdivision of the latter section has no bearing on the case.

(Syll. bus by the Court.)

*Error from District Court, Okmulgee County; Ernest B. Hughes, Judge.*

Action by Grant N. Jefferson and others against Wm. J. Cook and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

*James M. Hayes,* for plaintiffs in error.

*Geo. S. Ramsey, E. R. Perry, N. A. Gibson, Edgar A. De Meules* and *Malcolm E. Rosser,* for defendants in error.

TURNER, J. On May 7, 1915, Grant N. Jefferson and Mattie R. Wasson, for themselves, and Willie Noland Jefferson, by his guardian, John J. Jefferson, Jr., sued William J. Cook and Albert Z. English, as administrators of the estate of F. B. Severs, deceased, and others, in the district court of Okmulgee county. The material facts admitted by the demurrer to the petition are that John J. Jefferson, Jr., and one Mary Alice Jefferson were, on June 9, 1905, husband and wife, and were duly enrolled freedmen of the Creek Nation. On that day Mary Alice

Jefferson died, leaving her surviving her husband, John J. Jefferson, Jr., and as her only heirs at law their children, the plaintiffs, Grant N. Jefferson, Mattie R. Wasson, and Willie Noland Jefferson, and defendants Thurman Jefferson and Rebecca Jefferson, also Peggy Ann Jefferson, all duly enrolled citizens of said nation. On June 4, 1908, Peggy Ann Jefferson died intestate, a resident of said county, unmarried, a minor, without issue, and the owner of an allotment in the Creek Nation described in the petition, leaving her surviving her father, John J. Jefferson, Jr., and the plaintiffs, Grant N. Jefferson, Mattie R. Wasson, and Willie Noland Jefferson, and the defendants Thurman Jefferson and Rebecca Jefferson. Thereafter the father conveyed the land to F. B. Severs, from whom sprang up the chain of conveyances which is alleged to be a cloud on plaintiffs' title and which they seek to set aside. In the petition plaintiffs set up their title thus:

"The plaintiffs say that upon the death of the said Peggy Ann Jefferson, either under the laws of the State of Oklahoma, or under section 2531 of chapter 49 of Mansfield's Digest of the Laws of the State of Arkansas, which is in part as follows: 'In all cases where the intestate shall die without descendants, if the estate come by the father then it shall ascend to the father and his heirs; if by the mother, the estate, or so much thereof as came by the mother, shall ascend to the mother and her heirs'—the title to an undivided one-half interest in said land vested in her father, John J. Jefferson, Jr., and the other undivided one-half interest vested in her brothers and sisters, Mattie R. Wasson, Grant N. Jefferson, Thurman Jefferson, Rebecca Jefferson, and Willie Noland Jefferson, who survived her. The plaintiffs say that at all times since June 4, 1908, they have been and are now the joint owners of an undivided three-tenths interest in and to all of said property."

In sustaining a demurrer to their petition the court, in effect, held that they had no interest in the land, and that the father took title to the allotment as the sole heir of Peggy Ann under the laws of descent and distribution of the state. Rev. Laws 1910, sec. 8416 *et seq.* Counsel for plaintiffs contend that in this he erred, because, they say, that inasmuch as this allotment was, as stated in the deeds conveying to Peggy Ann both her homestead and surplus, made in pursuance of and subject to the terms of both the Original (Act March 1, 1901) and Supplemental Agreements (Act June 30, 1902), the Arkansas law of descent and distribution constituted a contract between Peggy Ann and the United States and the Creek Nation, and thus became a vested right in her, which, on descent cast, sent the land one-half to the father and the other to her brothers and sisters, as directed by section 6 of the Supplemental Agreement, which reads:

"The provisions of the act of Congress approved March 1, 1901 (31 Stat. L. 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory: Provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation: And provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to non-citizen heirs in the order named in said chapter 49." (32 Stat. 501.)

It is sufficient to say of this contention that the agreements referred to are not contracts, but acts of

Congress, subject to repeal by Congress at any time. In *Gritts v. Fisher*, 224 U. S. 640, 648, 32 Sup. Ct. 580, 583 (56 L. Ed. 928), the court, speaking to the Cherokee Agreement of 1902, said:

"The difficulty with the appellant's contention is that it treats the act of 1902 as a contract, when 'it is only an act of Congress and can have no greater effect.'"

See, also *Red Bird v. United States*, 203 U. S. 76-93, 27 Sup. Ct. 29, 51 L. Ed. 96, where such was again expressly held.

Such was, in effect, our holding in *Brady v. Sizemore et al.*, 33 Okla. 169-173, 124 Pac. 615-617. There we said:

"What we would hold if, prior to the ratification of said Supplemental Agreement and the consequent operation of said section 6, which in terms repealed the provisions of the Original Agreement in so far as the same provided for descent and distribution of the Creek Nation and substituted therefor the laws of descent and distribution contained in chapter 49 of Mansfield's Digest of Arkansas, rights have vested in virtue of that part of the act repealed, we need not state. It is sufficient to say that no such question is here presented, and no rights having thus accrued, Congress, prior thereto, had a right to change the legislative intent and make other provision regarding those allotments, which it did by enacting section 6, changing the course of their devolution, and provide, in effect, as it did that the laws of Arkansas should thereto apply, instead of the laws of the Creek Nation."

See *Sizemore et al. v. Brady*, 235 U. S. 441, 35 Sup. Ct. 135, 59 L. Ed. 308; Cooley on Constitutional Law, 512.

If it were necessary to cite additional authority to support this view, we might call attention to the fact that, as section 6 of the Supplemental Agreement expressly

repeals the provisions of the Original Agreement in so far as they provide for descent and distribution according to the laws of the Creek Nation, Congress thereby placed a legislative construction on the former act in keeping with what we have just held.

Whether the court erred in sustaining the demurrer to plaintiffs' petition turns upon the question of what effect Enabling Act, secs. 13 and 21, and Const. art. 25, sec. 2, had upon said section 6. And in order to determine whether the Enabling Act, which was general legislation, repealed said section in whole or in part, and substituted therefor the laws of descent and distribution of the Territory of Oklahoma extended to and put in force throughout the state when erected, it is necessary to first determine which part, if any, of said section is general, and which is special legislation; for it is as to the former only that the Enabling Act works a repeal, leaving unaffected such special legislation as may be contained in said section. And first let us see what led up to the enactment of section 6. Prior to Act May 2, 1890, c. 182, 26 Stat. 81, the Creeks maintained their own tribal government in that part of this state then known as the Creek Nation. They had their own laws, which were administered in their tribal courts, and among them laws governing the descent and distribution of property belonging to their citizens dying intestate. Then along came said act, which by sections 30 and 31 extended over and put in force in the Indian Territory certain general laws of Arkansas, and among them chapter 49 of Mansfield's Digest of 1884, which pertained to descent and distribution, with the proviso that:

"The judicial tribunals of the Indian Nations shall retain exclusive jurisdiction in all civil and criminal cases arising in the country in which members of the nation by nativity or by adoption shall be the only parties; and as to all such cases the laws of the State of Arkansas extended over and put in force in said Indian Territory by this act shall not apply."

But the operation of this proviso was much restricted when Congress by Act June 7, 1897, c. 3, 30 Stat. 83, provided that "the laws of the United States and the State of Arkansas in force in the territory shall apply to all persons therein, irrespective of race," and it was, in effect, rendered inoperative when Act June 28, 1898, c. 517, 30 Stat. 495, abolished all tribal courts in Indian Territory and in section 26 of the act provided that "the laws of the various tribes or nations of Indians shall not be enforced at law or in equity by the courts of the United States in the Indian Territory," all of which had the effect to displace the Creek tribal laws of descent and distribution and to put in force in that jurisdiction as a general law upon the statute books, applicable alike to all persons and estates, the Arkansas law of descent and distribution contained in chapter 49 aforesaid.

But to one familiar with the history of those times it is known that the Creeks were averse to allotment; that they clung tenaciously to their laws, and were especially anxious that their lands, when allotted and descent cast, should not be inherited by a stranger. This feeling was so strong when the Original Agreement of March 1, 1901, was entered into between certain representatives on the part of the United States and certain representatives on the part of the Creek Nation, that there was provided in section 7 thereof that after the homestead of an intestate

allottee had served its purpose the land should "descend to his heirs according to the laws of descent and distribution of the Creek Nation," and in section 28 that, if a citizen of the nation or a child entitled to allotment as such should die before receiving his or her share of the funds of the tribe, the land and money to which he would be entitled, if living, should also so descend. In thus deferring to the desires of this dependent people, it would seem that Congress, from out the general law of descent and distribution in force in Indian Territory, made an exception of the Creek and his allotted lands by thus placing upon the statute books special legislation, in effect that, in case of intestates, upon descent cast, those lands should descend according to the laws of descent and distribution of the Creek Nation.

We also know from the history of those times that, as the Creek law of descent and distribution thus put in force, when originally enacted by the Creeks, was intended to govern the distribution of personal property only, the same was not of easy application to govern the devolution of real estate, and for that reason the legislative mind soon thereafter changed and reverted to the laws of Arkansas as best adapted to meet the situation; that this change soon found expression in section 6 of the Supplemental Agreement, which by general legislation repealed that part of the Original Agreement which put in force the Creek law of descent and distribution, and again provided that the laws of Arkansas should govern the devolution of those allotments, and again deferred to the desires of the Creeks by adding thereto, in the way of special legislation, the two provisos appearing in said section giving to Creek citizens, male and female, and their descendants, a preferred right to the inheritance.

We say that part of section 6 which put in force chapter 49 of Mansfield's Digest was general legislation, for the reason that, standing alone, its effect was to extend that chapter in its operation so as to embrace all persons and estates in Indian Territory and thereby bring the Creeks and their allotted land within the general law of descent and distribution then in force in that jurisdiction. And *Washington v. Miller*, 235 U. S. 422, 35 Sup. Ct. 119, 59 L. Ed. 295, in effect so holds, and also that the two provisos to that section are special legislation. In so holding the court was discussing the question of whether said two provisos were repealed by a provision of Act April 28, 1904, c. 124, sec. 28, 33 Stat. 573, which reads:

"All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said territory, whether Indian, freedman, or otherwise"

—and which, in effect, it was contended, attempted to do what section 6, without the provisos, later accomplished, as we have seen. In passing, the court in effect held, as said act was general legislation, it did not repeal the two provisos, for the reason that they were special legislation. Referring to said provision, the court said:

"No repealing clause accompanied this provision, so the question is: Did it repeal the provisos by implication? There is no doubt that, if taken literally, it would subject the Creek lands to the Arkansas law of descent and distribution without any qualification or restriction. But this would be only by reason of the generality of its terms, for it made no mention of that law or of those lands. In short, it was plainly a general statute, and did not show that the attention of Congress was then particularly directed to the descent of lands of the Creeks. On the other hand, section 6 of the Supplemental Agree-

ment and its two provisos dealt with that subject in specific and positive terms, which made it certain that the Creeks and their lands were particularly in mind at the time.   In these circumstances we think there was no implied repeal, and for these reasons:   First, such repeals are not favored, and usually occur only where there is such an irreconcilable conflict between an earlier and a later statute that effect reasonably cannot be given to both.   *United States v. Healey,* 160 U. S. 136, 147, 16 Sup. Ct. 247, 40 L. Ed. 369, 373; *United States v. Great-house,* 166 U. S. 601, 605, 17 Sup. Ct. 701, 41 L. Ed. 1130, 1131.   Second, where there are two statutes upon the same subject, the earlier being special and the later general, the presumption is, in the absence of an express repeal, or an absolute incompatibility, that the special' [statute] is intended to remain in force as an exception to the general.   *Townsend v. Little,* 109 U. S. 504, 512, 3 Sup. Ct. 357, 27 L. Ed. 1012, 1015; *Ex parte Crow Dog (Ex parte Kang Gi-Shun-Co.)* 109 U. S. 556-570, 3 Sup. Ct. 396, 27 L. Ed. 1030, 1035; *Rodgers v. United States,* 185 U. S. 83, 87, 89, 22 Sup. Ct. 582, 46 L. Ed. 816, 819. And, third, there was in this instance no irreconcilable conflict or absolute incompatibility, for both statutes could be given reasonable operation if the presumption just named were recognized.   No doubt there was a purpose to extend the operation of the Arkansas law in various ways, but we think it was not intended that it should supersede or displace special statutory provisions enacted by Congress with particular regard for the Indians whose affairs were peculiarly within its control. *Taylor v. Parker,* 235 U. S. 42, 35 Sup. Ct. 22 [59 L. Ed. 121].   See, also, 32 Okla. 209, 122 Pac. 547."

Now, while it is readily seen that the Enabling Act worked a repeal of that part of section 6 which says that the descent and distribution of the lands and moneys provided for in the Original Agreement shall be in accordance with chapter 49 of Mansfield's Digest of the

Laws of Arkansas (for the reason that the act and that part of the section are both general legislation) and substituted therefor the laws of descent and distribution of Oklahoma Territory, inasmuch as the Miller Case holds that the act of April 28, 1904, *supra,* did not repeal the two provisos to that section, we cannot hold that the Enabling Act worked that result and substituted for chapter 49 and the two provisos the laws of descent and distribution of the territory, as we are asked to do. Rather are we of opinion that Enabling Act, sec. 13, which provides:

"That the laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said state until changed by the Legislature thereof"
—and section 21, which provides:

"And all laws in force in the Territory of Oklahoma at the time of the admission of said state into the Union shall be in force throughout said state, except as modified or changed by this act or by the Constitution of the state * * * "

—and Const. art. 25, sec. 2, which provides:

"All laws in force in the Territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the State of Oklahoma until they expire by their own limitation or are altered or repealed by law"

—substituted for the laws of descent and distribution contained in chapter 49 of Mansfield's Digest (as directed to apply in section 6) the laws of descent and distribution of the Territory of Oklahoma (i. e., Rev. Laws 1910, sec. 8416 *et seq.*), and left remaining in force as an exception thereto the two provisos in question, which

survive and operate as such so far as applicable upon the laws of the territory thus put in force throughout the state. For, while we entertain no doubt that the purpose of Congress, as expressed in the Enabling Act, was to extend the territorial laws of descent and distribution throughout the state, we do not think it was the intent of either Congress or the state to extend them further than to displace the local law on that subject, as contained in Mansfield's Digest, chapter 49, and directed to apply by section 6, and certainly not to supersede special legislation by Congress pertaining to the Indians, "whose affairs were peculiarly within its control." And so, we repeat, the Enabling Act and the Constitution substituted for the laws of descent and distribution contained in chapter 49 of Mansfield's Digest, directed to apply by section 6, the laws of the territory on that subject (Rev. Laws 1910, sec. 8416 *et seq.*) and left remaining in force as an exception thereto the provisos in question to survive and operate as such upon the laws of the Territory of Oklahoma thus extended, and that, too, for another reason. Section 6 of the Supplemental Agreement and the laws of descent and distribution of the territory thus put in force throughout the state were both acts of Congress and *in pari materia.* When such is the case, the rule of construction is as laid down by us in *Ratliff v. Fleener et al.,* 43 Okla. 652, 143 Pac. 1051, where, quoting approvingly from 36 Cyc. 1147, we said:

"Statutes *in pari materia* are those which relate to the same person or things. In the construction of a particular statute, or in the interpretation of any of its provisions, all acts relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law."

Which means that those acts should be construed as one act, and that both should stand so far as they are consistent with each other. Thus construed, the same result would follow; that is, the laws of descent and distribution contained in chapter 49 of Mansfield's Digest, directed to apply by section 6, would be superseded by the laws of descent and distribution of the territory, thus extended to and put in force throughout the state, with the provisos in question surviving and operating thereupon as such to the extent of limiting that law as extended, so that:

"Only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation," and "that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in" the laws of the State of Oklahoma.

This is no novelty in construction. In the Ratliff Case, *supra*, whether a peremptory writ of mandamus should run requiring the election board to place the name of plaintiff on the official ballot for the election to be held November 3, 1914, as a candidate for the office of register of deeds, turned upon a proper construction of an act approved May 1, 1913 (Laws 1913, c. 161), and an act approved May 19, 1913 (Laws 1913 c. 212), both passed at the same session of the Legislature, and both relating to the consolidation of offices. In that case, the acts being *in pari materia*, we said they must be construed together as one act, that the function of a proviso was to limit the language preceding it, and that section 1 of the latter act should operate as a proviso on section 5 of the former act, so as to read as set forth in the opinion. No contention being made that the laws of de-

scent and distribution in force in the Territory of Oklahoma on the advent of statehood are inapplicable to the devolution of Creek allotments, or that they have been changed by the Constitution or are repugnant thereto, it follows that they were extended to and put in force throughout the state at that time, operated upon by said provisos, as stated, and, being in force at the time of descent cast, govern the devolution of this allotment. But, all parties in interest being Creeks, we will deal no further with said provisos. Rev. Laws 1910 provide:

"8416. Succession is the coming in of another to take the property of one who dies without disposing of it by will.

"8417. The property, both real and personal, of one who dies without disposing of it by will, passes to the heirs of the intestate, subject to the control of the county court, and to the possession of any administrator appointed by that court for the purpose of administration.

"8418. When any person having title to any estate not otherwise limited by marriage contract, dies without disposing of the estate by will, it descends and must be distributed in the following manner: * * *   If decedent leave no issue, nor husband nor wife, the estate must go to the father or mother, or if he leave both father and mother, to them in equal shares. * * * "

From which we learn that, as intestate left no issue nor husband nor mother, the father takes the estate, and that plaintiffs, being brothers and sisters of deceased, take no title thereto nor share therein, and that the court was right in sustaining the demurrer to the petition.

There is no merit in the contention that the seventh subdivision of this section is the law applicable to the devolution of this estate. It reads:

"If the decedent leaves several children, or one child and the issue of one or more children, and any such surviving child dies under age, and not having been married, all the estate that came to the deceased child by inheritance from such decedent, descends in equal shares to the other children of the same parent, and to the issue of any such other children who are dead, by right of representation."

This for the reason that it is not true, as contended, that Peggy Ann inherited this allotment, one-half from her father, John J. Jefferson, Jr., and one-half from her mother, Mary Alice Jefferson. While heretofore we may have indulged in fiction in construing the laws governing the devolution of Creek allotments, we have not gone so far as to hold that one can inherit from the living. And such we would do if we would here hold that this allottee, who received deeds to her allotment April 10, 1903, and filed them of record April 17, 1903, inherited any part of the land in controversy from her mother, who died June 9, 1905, or any part from her father, who is still living. And if we should so hold it might be difficult to say why the moiety thereof inherited from the mother should not be chargeable with the payment of the mother's debts in the hands of her administrator.

And there is nothing in the case of *Shulthis v. Mc-Dougal,* 170 Fed. 529, 95 C. C. A. 615, or any other case that we know of, which would justify such holding. It is contended that this case held Creek allotments to be ancestral estates, and that it follows that this allotment was derived by inheritance from the father and mother of Peggy Ann. Not so. To be sure the case holds the allotment to be a birthright, and comes to the allottee by the

blood of his or her tribal parent or parents, as the case may be; but that case far from holds that it comes thus by inheritance, but, on the contrary, does hold:

"The lands of that tribe fit into neither of the classes mentioned in the statute [reference being made to an ancestral estate and new acquisition]. They did not come to a member of the tribe by inheritance from any ancestor, nor could they be spoken of with propriety as a purchase."

But why refine on the character of this estate to determine whether it is ancestral or not? In our view of the statute under construction, such is unnecessary. The statute is clear. Section 8418, *supra*, reads:

"When any person having title to any estate not otherwise limited by marriage contract, dies without disposing of the estate by will, it descends and must be distributed in the following manner."

Which means that, when any person shall die intestate having title to any estate or any kind of an estate, no matter how acquired—whether by descent or purchase, or whether it is ancestral or a new acquisition —not otherwise limited, etc., if deceased leaves no issue, nor husband nor wife, the estate must go to the father, etc.

As counsel for plaintiffs fail to point out where, in Act Cong. May 29, 1908, c. 216, 35 Stat. 444, there is an express declaration by Congress that it had not, prior to that date, either by the Enabling Act or by the Constitution of the state, subjected the lands and property of the Indians to the laws of descent and distribution of the Territory of Oklahoma, and we can find no such declaration therein contained, we lay that act out of this case, especially as counsel on neither side claim any

rights under that act, or that the same in any way affects the devolution of this estate.

As we are of opinion that the father, John J. Jefferson, Jr., inherited the entire allotment to the exclusion of the brothers and sisters of the deceased allottee, and that the court did right in sustaining the demurrer to the petition, the judgment of the trial court is affirmed, and the application for the appointment of a receiver is dismissed.

All the Justices concur.