In re ESTATE OF ROBERT PIGEON, PIGEON, Adm'x, v. STEVENS et al.

No. 11235—Opinion Filed April 5, 1921.

(Syllabus.)

1. Indians—Descent and Distribution—Oklahoma Law Applicable.

All Indian lands from which restrictions have been removed, upon the death of allottee, descend according to the laws of descent and distribution of the state of Oklahoma.

2. Same—Descent of Creek Allotment—Rights of Noncitizen Heirs — Effect of Statehood.

Sections 13 and 21 of the Enabling Act of June 16, 1916 (34 Stat. L. 267, ch. 3335), admitting Oklahoma as a state into the Union provided: "That the laws in force of the territory of Oklahoma as far as applicable shall extend over and apply to said state until charged by the Legislature," and "shall be in force throughout said state ex-

cept as modified or changed by this act or the Constitution of Oklahoma"; and section 2 of the schedule to the Constitution provides: "All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union which are not repugnant to the Constitution and which are not locally inapplicable shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law." Held, under said provisions of the Enabling Act and the Constitution, chapter 49 - of Mansfield's Digest of the Laws of Arkansas and the provisos of section 6 of the Supplemental Creek Agreement of June 30, 1902, qualifying said chapter 49, were repealed, and the devolution of an estate of a deceased Creek allottee having died since the admission of Oklahoma into the Union is governed by the laws of descent and distribution of the state of Oklahoma, and noncitizen heirs may inherit.

**3. Statutes—Repeal of Statute by Substitution—Effect on Provisos.**

A new statute revising the whole subject-matter of an old one and intended as a substitute therefor, although there is no repealing clause, will operate to repeal the old law and upon the repeal of a statute containing a proviso the proviso falls with the statute.

Kane, Pitchford, and Johnson, JJ., dissenting in part.

Error from District Court, Muskogee County; Chas. G. Watts, Judge.

Action for determination of heirship In re Estate of Robert Pigeon, deceased. From judgment of district court affirming order of county court decreeing heirship and making distribution in favor of Idella M. Stevens and certain other heirs, Josie Pigeon, administratrix, brings error. Reversed and judgment entered for plaintiff in error.

Irwin Donovan and Crump, de Graffenried & White, and Geo. S. Ramsey, for plaintiff in error.

W. W. Noffsinger and A. L. Harris, for defendant in error.

KENNAMER, J. The plaintiff in error, Josie Pigeon, in her individual capacity and as administratrix of the estate of Robert Pigeon, deceased, has appealed to this court from a judgment rendered by the district court of Muskogee county, affirming an order of the county court of Muskogee county decreeing heirship and making an order of distribution in the matter of the administration of the estate of Robert Pigeon, deceased; the cause being submitted in the county and district courts of Muskogee county upon the following agreed statement of facts:

"That said Robert Pigeon, deceased, was a citizen of the half-blood of the Creek Nation or Tribe of Indians, and was duly enrolled as such opposite No. 125 of the final roll of the Creeks by blood; that said Robert Pigeon died intestate on or about the 8th day of October, 1918, in the city of Muskogee, Muskogee county, Oklahoma; that said Robert Pigeon, at the time of his death, was the owner of the southwest quarter of section eighteen (18), township fourteen (14), range thirteen (13) east, in Okmulgee county, Oklahoma; that said land was the allotment of said Robert Pigeon, deceased, the same having been allotted and patented to him as a citizen of the Creek nation as his distributive share of the land of said Creek Nation; that forty (40) acres of said allotment was the homestead of said Robert Pigeon, the remaining one hundred twenty (120) acres being his surplus allotment. That the appellant, Josie Pigeon, is the lawful widow of the said Robert Pigeon, deceased, having been married to him after the admission of Oklahoma as a state into the Union. That at the time of the death of said Robert Pigeon he had no living father, mother, brother or sister, nor any descendant thereof, and that said Robert Pigeon died without issue, no children having been born to him since March 4, 1906, or at any other time. That at the time of the death of the said Robert Pigeon, deceased, he left surviving him the following relatives, in addition to his widow: Josie Pigeon, the appellant herein; Idella M. Stevens, who was an aunt on his mother's side; Thomas J. Berryhill, a half-brother of the mother of the said Robert Pigeon, deceased, and Lena Pigeon, Joseph Pigeon, Jakeman Pigeon, and Cammaline Pigeon, children of John Pigeon, deceased, who was a brother of the deceased's father, and own cousins of the said Robert Pigeon, deceased, also Tiger Pigeon, Peggy Harjoe, nee Pigeon, now the wife of John Harjoe, children of Dave Pigeon, who was also a brother of the deceased's father, and own cousins of the said Robert Pigeon, deceased. That the widow, Josie Pigeon, appellant herein, is a white woman and not a citizen of the Creek Nation; that all other relatives mentioned herein were and are citizens of the Creek Nation, enrolled as such."

On this appeal but one proposition of law is presented to the court for decision, and that is, What is the law governing the devolution of the estate of Robert Pigeon, deceased, who died about the 8th day of October, 1918?

The agreed statement of fact shows that Robert Pigeon, deceased, was enrolled opposite Roll No. 125 as a member of the Creek Tribe of Indians of the half-blood. The surplus allotment of the deceased allottee, under section 16 of the Supplemental Creek Agreement, approved by the act of Congress

of June 30, 1902 (32 Stat. L. 500; Thomas' Five Civilized Tribes and Osage Nation, page 129), and under the act of May 27, 1908 (35 Stat. L. 312), was unrestricted land; and the record not disclosing that any of the parties to this controversy are full-blood Indians, the homestead of the deceased allottee became unrestricted upon the death of said allottee, under section 9 of the act of Congress of May 27, 1908 (35 Stat. L. 312).

There is no doubt but that section 8418 of the Revised Laws of 1910, par. 5, which provides: ·

"If the decedent leave a surviving husband or wife, and no issue, and no father, nor mother. nor brother, nor sister, the whole estate goes to the surviving husband or wife"

—would govern the devolution of the estate in controversy if the deceased had not been a member of the Creek Tribe of Indians, but it is contended by the defendants in error that the proviso of section 6 of the Creek Supplemental Treaty, approved July 30, 1902, which provides:

"That only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation; and provided, further, that if there be no person of Creek citizenship to take the descent and distribution of said estate then the inheritance shall go to noncitizen heirs in the order named in said chapter 49"

—governs the devolution of the estate in controversy, and counsel for the defendants in error rely upon the cases of Scott v. Ryal, 78 Okla. 12, 186 Pac. 206; Jefferson v. Cook, 53 Okla. 272, 155 Pac. 852; Thompson v. Cornelius, 53 Okla. 85, 155 Pac. 602; and Privett v. Rentis, 75 Okla. 191, 182 Pac. 898; Hughes et al. v. Bell et al., 55 Okla. 555, 155 Pac. 604; and it must be conceded that if the decisions of this court, especially Thompson v. Cornelius, are followed in the case at bar, the judgment of the trial court decreeing the defendants in error to be citizens of the Creek Nation and entitled to inherit the estate in controversy to the exclusion of Josie Pigeon, the noncitizen wife of the deceased, must be affirmed, but, upon an exhaustive examination of the authorities and a careful consideration of the same, we are of the opinion that the rule announced in the case of Thompson v. Cornelius, supra, is unsound and should be overruled, and the subsequent cases following the same rule.

Upon an examination of the case of Thompson v. Cornelius, supra, we find that the court held that section 9 of the act of Congress of May 27, 1908, ch. 199, 35 Stat. L. 312, had nothing to do with said cause, and the opinion in part is as follows:

"Defendant next contends that Rev. Laws of Okla. 1910, sec. 8416 et seq., without said provisos, is the governing statute here, because, he says the same was made applicable by act of Congress May 27, 1908, ch. 199, 35 Stat. L. 312, in force at the time descent was cast. He relies upon section 9, which reads: 'That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land; provided, that no conveyance of any interest of any full-blood Indian heir in such lands shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee; provided, further, that if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof, for the use and support of such issue, during their life or lives, until April 26, 1931; but if no issue survive, then such allottee, if an adult, may dispose of his homestead by will free from restrictions: if this be not done, or in event the issue hereinbefore provided for die before April 26, 1931, the land shall then descend to the heirs according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions; provided, further, that the provisions of section 23 of the act or April 26, 1906, as amended by this act, are hereby made applicable to all wills executed under this section.' He contends. that the words 'the lands,' as used in the second proviso, refer to the whole allotment, as did the same words in section 7 of the Original Creek Agreement, and cites in support of his contention Woodward v. de Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310, approving our construction of said section in de-Graffenried v. Iowa Land & Trust Co., 20 Okla. 687, 95 Pac. 624. Assuming, but not deciding, that such contention is correct, section 9 has nothing to do with this case. This for the reason that said section is dealing only with lands of any allottee whose death ipso facto removes restrictions on its alienation. This is patent from the language with which the section starts out: 'That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land.' This is immediately followed by a proviso, in effect: 'That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless,' etc. And providing further, in effect, that if any member of the tribes of a certain or more quantum of blood shall die leaving certain issue born since a certain time, the homestead of such deceased allottee (of course in such land) shall remain inalienable (unless, etc.) for the use of certain issue until a certain time, but if no such issue survive, then such allottee, if an adult, may dispose of his homestead (in

such allotted land) by will, etc., and if this be not done or the issue referred to die before a certain time, the land shall then descend, etc. As the pleading demurred to fails to disclose that the restrictions on the allotment of Percilla were removed ipso facto upon her death, and hence the same fell within the class of allotments designated by this act, we repeat that this act had nothing to do with this case."

It is apparent from that part of the opinion above quoted that the court fell into the error of failing to observe that Congress, in section 9, of the act of May 27, 1908, supra, recognized that the law of Oklahoma of descent and distribution unqualifiedly governed the devolution of estates of unrestricted Indians, and in plain and unambiguous language expressly says that the lands of allottees of one-half or more Indian blood shall descend under the law of descent and distribution of the state of Oklahoma. There is no escape from the language of the proviso of section 9 of said act putting in force the laws of Oklahoma and specifically applying the same to the descent and distribution of the estates of allottees of the half-blood, or more; and in said case, supra, the court based its decision upon the proposition that the lands in controversy were restricted lands, and that was the very class of lands that the proviso of section 9 of the act of May 27, 1908, supra, in plain and unmistakable language provided that the laws of Oklahoma of descent and distribution shall govern the devolution of the same. It is very obvious that the Congress recognized that Indian lands located within the state of Oklahoma from which restrictions had been removed were subject to the operation of the state laws, and by section 4 of said act provided that said lands should be subject to the laws of the state.

Upon the admission of the state of Oklahoma into the Union the same came into the Union with all the powers and sovereignty of any other state, and upon the removal of restrictions against alienation and the granting of full citizenship to Indians the federal government ceased to have any further power or control over the tribal citizens with respect to unrestricted lands, and all laws passed by Congress prior to statehood, either general or special, ceased with the admission of Oklahoma as a state to have force or effect in so far as unrestricted lands of tribal citizens are concerned, and the Supreme Court of the United States has forever settled the question that Indian lands within a state or territory that has a local form of government, are subject to the laws of the state or territory.

The Supreme Court of the United States, in the case of John Schrimpscher et al. v. John S. Stockton et al., 183 U. S. 290, 46 L. Ed. 203, was reviewing a judgment of the Supreme Court of Kansas. The Supreme Court of Kansas had held that the state statute of limitation applied to the allotment of a Wyandotte Indian and commenced to run against the heirs of a deceased allottee from the date of the treaty which terminated the restriction on said lands or the disability of the heirs to alienate the same, and the court, in affirming the judgment of the Supreme Court of Kansas, speaking through Mr. Justice Brown, said:

"Their disability terminated with the ratification of the treaty of 1868. The heirs might then have executed a valid deed of the land, and possessing, as they did, an unencumbered title in fee simple, they were chargeable with the same diligence in beginning an action for their recovery as other persons having title to lands; in other words, they were bound to assert their claims within the period limited by law."

In the case of Goudy v. Meath, 203 U. S. 146, the Supreme Court of the United States in passing upon the authority of the state of Washington to collect taxes from lands having been allotted to members of the Puyallup Tribe of Indians, in an opinion by Mr. Justice Brewer, said:

"Among the laws to which the plaintiff as a citizen became subject were those in respect to taxation. His property, unless exempt, became subject to taxation in the same manner as property belonging to other citizens, and the rule of exemption for him must be the same as for other citizens, that is, that no exemption exists by implication, but must be clearly manifested. No exemption is clearly shown by the legislation in respect to these Indian lands. The original treaty provided that they should be exempt from levy, sale or forfeiture until the Legislature of the state should, with the consent of Congress, remove the restriction. This, of course, meant involuntary as well as voluntary alienation. When the state was admitted and its Constitution formed, its Legislature granted the power of alienation 'in like manner and with like effect as any other person may do under the laws of the United States and of this state, and all restrictions in reference thereto are hereby removed.' What restrictions? Evidently those upon alienation. The Indian may not only voluntarily convey his land (authority to do that is provided by the use of the word 'grant'), but he may also permit its alienation by any action or omission which in due course of law results in forced sale. Congress postponed the operation of this statute for ten years. When the ten years expired (and they had expired before this tax was attempted to be levied) all restrictions upon alienation ceased. It requires a technical and narrow construction to hold that involuntary alienation continues

to be forbidden while the power of voluntary alienation is granted; and it is disregarding the act of Congress to hold that the Indian, having property, is not subject to taxation when he is subject to all the laws, civil and criminal, of the state."

In the case of Johnson v. Johnson, 72 Oklahoma, 179 Pac. 595, this court approved the doctrine announced in the case of Goudy v. Meath, supra.

In the case of Dickson v. Luck Land Co., 242 U. S. 371, 61 L. Ed. 371, the court had before it a case appealed from the Supreme Court of Minnesota involving an allotment of land made on the White Earth Indian reservation in the state of Minnesota. The lands were allotted by the allottee under a treaty which restricted the same and providing that the United States would hold the land in trust for the period of 25 years, and at the expiration of that period would convey the same to the allottee, or his heirs, by patent in fee, discharged of such trust and free of all charges or incumbrances; and also that if any conveyance should be made of the land or if any contract should be made touching the same, before the expiration of the trust period, such conveyance or contract should be absolutely null and void. Afterwards, upon the allottee's application, a fee-simple patent was issued to him under the provision of a subsequent act providing that all restrictions as to the sale, incumbrance, or taxation of allotments within the White Earth reservation in the state of Minnesota, "heretofore or hereafter held by an adult mixed Indian, are hereby removed." The grantee immediately upon receiving his patent executed two deeds. The grantee in the second deed filed an action against the grantee in the first deed to determine who had title to the land. The plaintiff contended that the deed given during his minority was disaffirmed and avoided by the one given after the minor became of age. The defendant contended that the patent was conclusive of the minor having attained his majority, and the plaintiff, in the trial of the case, was permitted to show the allottee's age by other evidence than the patent, and in deciding the case Mr. Justice Van Devanter, speaking for the court, said:

"With those restrictions entirely removed and the fee-simple patent issued, it would seem that the situation was one in which all questions pertaining to the disposal of the lands naturally would fall within the scope and operation of the law of the state. And that Congress so intended is shown by the act of May 8, 1906, ch. 2348, 34 Stat. L. 182, Comp. Stat. 1913, section 4203, which provides that when an Indian allottee is given a patent in fee for his allotment he 'shall have the benefit of and be subject to all the laws, both civil and criminal, of the state.' Among the laws to which the allottee became subject, and to the benefit of which he became entitled, under this enactment, were those governing the transfer of real property, fixing th age of majority, and declaring the disability of minors."

The United States Supreme Court again, in the case of United States v. Waller, 243 U. S. 452, held that when all restrictions against alienation are removed and the allottee has fee-simple title, the federal government "has no further interest in or control of the land.".

The Congress of the United States, by the act of April 28, 1904, 33 Stat. L. 573, ch. 1824, extended the laws of Arkansas theretofore put in force in the Indian Territory so as to embrace all persons and estates in said territory, whether Indian, freedman, or otherwise, and said laws of Arkansas operated as the local laws in force in said territory applicable to all citizens, and the Supreme Court of the United States, in the case of Taylor v. Parker, 235 U. S. 42, 59 L. Ed. 121, held that the extension of said laws enabled the Indian to devise all his alienable property by will made in accordance with the laws of the state of Arkansas, which shows that the Supreme Court of the United States has uniformly adhered to the doctrine that unrestricted Indian lands are subject to the local laws of a territory or state within which said lands are located.

The Supreme Court of Kansas, in the case of Moore v. Wa-me-go et al., 83 Pac. 400, held:

"February 8, 1887, Congress enacted a statute (chapter 119, 24 Stat. 388) providing for the allotment of lands among Indian bands and tribes and to confer upon the allottees the right of citizenship in the state where the lands were located. Section 6 of this act has special application here and reads: 'That upon the completion of said allotments and the patenting of the lands of said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law.' By this statute Congress evidently intended to elevate these allottees from the irresponsible condition of 'wards of the nation', to the position of free and independent citizens of the United States, and of the state of Kansas. United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; In re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848; In re Now-ge-zhuck, 69 Kan. 410, 67 Pac. 877. As soon as the allot-

ment was completed these parties became subject to all the laws of the state of Kansas and were absolved from all their tribal relations."

This court, in the case of Burtschi et al. v. Wolfe et al., decided January 8, 1921, 81 Okla. —. 198 Pac. 326, speaking through Mr. Justice Kane, said:

"In reaching this conclusion we reject the premise assumed by counsel for the defendant in error that, before an Indian is entitled to sell his lands, either inherited or allotted, we must be able to point our finger to some act of Congress specifically authorizing such sale. In our judgment the opposite presumption is true. Indians, unless they are restricted, either in their person or their property by some specific act of Congress or applicable state law, have the same right to dispose of their property as white citizens of the state and of the United States."

Section 4 of the act of Congress of May 27, 1908, 35 Stat. L. 312, is as follows:

"That all land from which restrictions have been removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes; provided, that allotted lands shall not be subject or held liable to any form of personal claim, or demand, against the allottees arising or existing prior to the removal of restrictions, other than contracts heretofore expressly permitted by law."

We, therefore, conclude there is no escape from the inevitable conclusion that lands from which restrictions have been removed are subject to all the laws of the state of Oklahoma, and that Congress provided the only exception in that said lands shall not be held liable to any form of personal claim or demand against the allottee arising or existing prior to the removal of restrictions, and the Supreme Court of the United States by its decision held that said lands are non-taxable according to the provisions of the treaty under which said lands were allotted, basing its decision upon the ground that the members of the Indian Tribes had relinquished their equitable interest in the lands in common and received allotments in severalty, and that the relinquishment of the allottee of all his claim in the common land property was sufficient consideration to have said lands allotted to him in severalty, protected from taxation as stipulated in the treaty under which the lands were allotted. Therefore, it is clear that the allottee acquired a vested right to have his allotted lands protected from taxation according to the terms of the treaty. Choate et al. v. Trapp, Secretary State Board of Equaliza-

tion, 224 U. S. 665, 56 L. Ed. 941. But no authority can be found sustaining the proposition that any person has a vested right by virtue of a law of descent and distribution prior to the time descent was cast; but, on the contrary, the Supreme Court of the United States, in the case of Jefferson et al. v. Fink et al., 247 U. S. 288, 62 L. Ed. 1117, held there is no vested right in such law. The opinion in part is as follows:

"The making of an Indian allotment and the issuance of tribal deed under the Supplemental Creek Agreement of June 30, 1902 (32 Stat. L. 500, ch. 1323), which contained a provision that the descent of Creek allotments should be according to the Arkansas law, which had theretofore been put in force in the Indian Territory, did not invest those who would be heirs under the law with a right to inherit which could not be taken away or impaired by subsequent federal or state legislation substituting the Oklahoma law of descent for that of Arkansas."

The Supreme Court of the United States, in the case of Sizemore v. Brady, 235 U. S. 440, 59 L. Ed. 308, in unmistakable language repudiated the doctrine that the law of descent conferred a vested right upon a Creek citizen to inherit the lands of a deceased allottee under the law of descent as found in the Original Creek Agreement of March 1, 1901 (31 Stat. L. 861, ch. 76), and held that said treaty, in effect, was nothing more than an act of Congress and could have no greater force or effect, and Mr. Justice Van Devanter, speaking for the court, said:

"On the part of the maternal cousins it is contended that the provisions in the Original Agreement relating to the allotment and distribution of the tribal lands and funds were in the nature of a grant in praesenti, and invested every living member of the tribe and the heirs, designated in the tribal laws, of every member who died after April 1, 1899, with an absolute right to an allotment of lands and a distributive share of the funds, and that Congress could not recall or impair this right without violating the due process of law clause of the 5th Amendment to the Constitution. To this we cannot assent. There was nothing in the agreement indicative of a purpose to make a grant in praesenti. On the contrary, it contemplated that various preliminary acts were to precede any investiture of individual rights. The lands and funds to which it related were tribal property, and only as it was carried into effect were individual claims to be fastened upon them. Unless and until that was done Congress possessed plenary power to deal with them as tribal property. It could revoke the agreement and abandon the purpose to distribute them in severalty, or adopt another mode of distribution, or pursue any other

course which to it seemed better for the Indians. And without doubt it could confine the allotment and distribution to living members of the tribe, or make any provision deemed more reasonable than the first for passing to the relatives of deceased members the lands and money to which the latter would be entitled, if living. In short, the power of Congress was not exhausted or restrained by the adoption of the Original Agreement, but remained the same thereafter as before, save that rights created by carrying the agreement into effect could not be devested or impaired."

The following authorities support the proposition that such treaties as the Supplemental Creek Treaty of June 30, 1902 (32 Stat. L. 500, ch. 1323), are regarded as nothing more in effect than acts of Congress and are subject to change by Congress at any time before the same are carried into effect: Cherokee Intermarriage Cases, 203 U. S. 76, 51 L. Ed. 96; Stephens v. The Cherokee Nation, 174 U. S. 445, 43 L. Ed. 1041; Cherokee Nation v. Hitchcock, 187 U. S. 294, 47 L. Ed. 183; Edye et al. v. Robertson et al., 112 U. S. 580, 28 L. Ed. 798-804; Gritts v. Fisher, 224 U. S. 640, 56 L. Ed. 928; Sizemore v. Brady, 235 U. S. 440, 59 L. Ed. 308-312.

It has been held that the right to allot land of the Creek Nation was not a vested right until it had been exercised, and could be withdrawn before the right to allot was exercised. Gritts v. Fisher, 224 U. S. 640, 56 L. Ed. 928, supra. Unquestionably, if the right to allot land could be withdrawn, the right to inherit prior to the time descent is cast may be withdrawn. All that any person may have under a law of descent prior to the time descent is cast is the mere expectancy to inherit the property of the deceased, provided the law is not repealed prior to the death of the deceased, and, as was said by Mr. Justice Clark in the case of Campbell v. Wadsworth, 248 U. S. 192, "All statutes of descent and distribution are arbitrary expression of the law-making power," and the law-making power may decree at any time who are to be the beneficiaries under the law of descent and distribution.

Then it is clear that the lands of the Five Civilized Tribes from which restrictions have been removed are subject to the operation of the laws of the state, and the only exceptions to be recognized are the protection from taxation as provided in the treaty and the exemption from liability on demands existing prior to removal of restrictions.

Under section 4 of the act of May 27, 1908, supra, the lands from which restrictions were or shall be removed shall be subject to all civil burdens as though they were the property of other persons than allottees of the Five Civilized Tribes. Said act clearly shows an intention on the part of the Congress to treat unrestricted lands within the state of Oklahoma the same as the property of any other citizen, and in case an unrestricted Indian should execute a conveyance in which he was defrauded out of his unrestricted lands, he would have to appeal to the courts of Oklahoma for protection, and could not maintain an action in any other court. If he desired to will or contract with regard to his unrestricted lands, the same would have to be executed according to the laws of Oklahoma. If he desired to eject a trespasser from his unrestricted lands, he would have to appeal to the courts of Oklahoma for relief, and in case of the death of such unrestricted Indian his lands must be distributed to the heirs according to the laws of Oklahoma.

In the case at bar, the deceased allottee being an Indian of the one-half blood, the surplus part of the allotment was unrestricted in the hands of the allottee and the homestead part of the allotment was restricted, but the record fails to disclose whether any of the parties to this controversy claiming to be heirs are restricted Indians, but under section 9 of the act of Congress of May 27, 1908, the laws of the state of Oklahoma, in unmistakable language, are made to apply to the devolution of the estates of restricted Indians, and under sections 13 and 21 of the Enabling Act of June 16, 1906, 34 Stat. L. 267, ch. 3335, under which Oklahoma was admitted as a state into the Union, it is provided "that the laws in force of the territory of Oklahoma as far as applicable shall extend over and apply to said state until changed by the Legislature", and, that all such laws in force at the time of the admission of the state into the Union "shall be in force throughout said state, except as modified or changed by this act or by the Constitution of the state." Now, Congress was without authority to provide any local laws for the newly created state or its people, except the Indian tribes located within the state; so it is evident that Congress by said provisions substituted for the Arkansas law of descent and distribution, which was then in force among the various tribes of Indians, the laws of the territory of Oklahoma, and that Congress did substitute the general laws of the territory of Oklahoma governing the descent and distribution of the estates of deceased allottees and thereby repealed the laws of the state of Arkansas has been settled by a number of decisions by this court and the Supreme Court of the United States. Jefferson v. Fink, 247 U. S. 288, 62 L. Ed. 1117. And it is a well settled rule of law

that a proviso is a subsidiary and dependent part of a statute, and when a statute which contains a proviso is repealed the proviso will fall with the statute and will not continue in force as an independent enactment. Black on Interpt. of Laws, page 271; Church v. Stadler, 16 Ind. 463; Nusser v. The Commonwealth, 25 Pa. 126; McDermott v. Nassau Electric R. Co., 32 N. Y. Supp. 884; In re Day et al., 181 Ill. 73, 54 N. E. 646.

The provisos of section 6 of the Supplemental Creek Agreement of June 30, 1902, 32 Stat. L. 500, ch. 1323, confining the devolution of Creek lands to citizens of the Creek Nation and their descendants, were adopted as a proviso to said treaty adopting chapter 49 of the Laws of Arkansas, which governed the descent and distribution of estates of deceased allottees prior to admission of Oklahoma into the Union, and when the Congress substituted the laws of Oklahoma for the laws of Arkansas, under the above rule of construction the provisos fell with the statute.

A rule of law universally recognized is that a new statute revising the whole subject-matter of an old one and intended as a substitute for it, although there is no clause to that effect, will operate as a repeal of the old law. Norris v. Crocker, 13 How. (U. S.) 429; United States v. Tynen, 11 Wall. (U. S.) 95; State v. Rogers, 10 Nev. 319; Steamboat Co. v. The Collector, 18 Wall. (U. S.) 478.

In the case of Smock v. Farmers' Union State Bank, 22 Okla. 825, this court approved the rule announced by Sutherland on Statutory Construction, as follows:

"If the new act is intended as a revision and substitute for the former act or acts, the general rule applies, and the former act or acts are repealed in toto. though they may contain parts or provisions which are not embraced in the new act and are not repugnant to its provisions."

In the case of Shannon v. The People, 5 Mich. 84, the Supreme Court held:

"That where a subsequent statute covers the whole ground occupied by an earlier statute, it repeals, by implication, the former statute, although there be no repugnance." Commonwealth v. Cooley, 10 Pick. 37; Goodnow v. Buttrick, 7 Mass. 140.

The Supreme Court of Maine, in the case of Towle v. Marret, 14 Am. Dec. 206, held:

"An act of the Legislature of Maine relating to the same subject as a statute of Massachusetts continued in force by the act of separation, but expressing different sentiments, establishing different principles, and containing provisions better suited to the people of Maine, is a virtual repeal of the act of Massachusetts."

Undoubtedly the Congress in extending the laws of the territory of Oklahoma in force throughout the new state and making the same applicable to the only class of citizens (the Indian tribes) that Congress was vested with authority to legislate for within the new state, evidenced a purpose of abolishing the different tribal laws and provisos of the same which in their operation disinherited their own children, and certainly it cannot be contended that such conditions as existed under such laws were conducive to the best interests of the members of the tribe. Surely Congress did not intend to continue in force a system of laws that denies to the wife the right to inherit her husband's property, or the children to inherit from their parents. It is more in keeping with reason and justice that the Congress intended to substitute a new order of things and conform the law of descent to a natural and reasonable operation. And, upon an examination of the act of Congress of May 27, 1908, supra, it is plain that the Congress recognized the fact that the laws of Oklahoma were applicable to unrestricted Indian lands, and to remove all doubt that the laws of Oklahoma should control, section 9 of said act specifically provided that restricted land shall descend according to the laws of the state of Oklahoma, and in sections 13 and 21 of the Enabling Act the Congress specifically made the laws of the territory of Oklahoma operative upon the only class of citizens that the Congress was vested with power to legislate for within said state. And a rule of statutory construction uniformly adhered to by the courts is that every statute is to be construed with reference to its intended scope and the purpose of the Legislature in enacting it, and there is no reason to doubt that the Congress in extending the laws of the territory of Oklahoma in force in the state intended for the same to apply to that class of citizens that Congress was vested with power to legislate for within said state in order that the citizens of the new state would be provided with a system, as nearly as possible, of uniform laws.

In the case of Jefferson v. Fink, supra, the Supreme Court of the United States said:

"In early times, when allotments in fee simple to individual Indians were made only occasionally, there was no congressional enactment prescribing who should inherit allotted land on the death of the allottee, and in such cases it was held that while the tribal relation continued the applicable rule of descent was to be found in the laws and usages of the tribe, and not in the laws of

the state or territory in which the land lay. Jones v. Meehan, 175 U. S. 1, 29-32, 44 L. Ed. 49, 60-62, 20 Sup. Ct. Rep. 1. In actual practice this rule proved unsatisfactory, because the tribal law and usages were generally crude and often difficult of ascertainment; and so in later allotment acts Congress provided that the descent should go according to the state or territorial law. * * * Referring to the purpose with which the Arkansas statutes were put in force in that territory and to their status there, this court said in Shulthis v. McDougal, 225 U. S. 561, 571, 55 L. Ed. 1205, 1211, 32 Sup. Ct. Rep. 704: 'Congress was then contemplating the early inclusion of that territory in a new state, and the purpose of those acts was to provide, for the time being, a body of laws adapted to the needs of the locality and its people in respect of matters of local or domestic concern. There being no local Legislature, Congress alone could act. Plainly, its action was intended to be merely provisional.' By the Enabling Act of June 16, 1906, ch. 3335, 34 Stat. L. 267, provision was made for admitting into the Union both the territory of Oklahoma and the Indian Territory as the state of Oklahoma. Each territory had a distinct body of local laws. Those in the Indian Territory, as we have seen, had been put in force there by Congress. Those in the territory of Oklahoma had been enacted by the territorial legislature. Deeming it better that the new state should come into the Union with a body of laws applying with practical uniformity throughout the state, Congress provided in the Enabling Act (sec. 13) that 'the laws in force in the territory of Oklahoma as far as applicable shall extend over and apply to said state until changed by the legislature thereof;' and also (sec. 21) that 'all laws in force in the territory of Oklahoma at the time of the admission of said state into the Union shall be in force throughout said state, except as modified or changed by this act or by the Constitution of the state.' The people of the state, taking the same view, provided in their Constitution (art. 25, sec. 2) that 'all laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law.' The state was admitted into the Union November 16, 1907; and thereupon the laws of the territory of Oklahoma relating to descent and distribution (Oklahoma Revised Statutes 1903, ch. 86, art. 4) became laws of the state. Thereafter Congress by the act of May 27, 1908, ch. 199, 35 Stat. L. 312, sec. 9, recognized and treated 'the laws of descent and distribution of the state of Oklahoma' as applicable to the lands allotted to members of the Five Civilized Tribes."

Now, it is plain that the Supreme Court of the United States held that the purpose of Congress in extending the laws of the territory of Oklahoma in force throughout the state was that the new state should have a system of laws applicable with practical uniformity, and that the tribal laws governing the descent and distribution of estates, which were crude and often difficult of ascertainment, should be abolished. For a number of years Congress had evidenced an intention of preparing the members of the different tribes for full citizenship and the benefits of a new order of things. So we conclude that the Congress intended by extending the laws of the territory of Oklahoma in force throughout the state that said laws were to be applicable to Indians and their estates, and that since the admission of Oklahoma as a state into the Union the devolution of the estates of deceased allottees of the different tribes of Indians is governed by the laws of the state of Oklahoma.

To hold that the Congress, under the Enabling Act and the act of May 27, 1908, did not intend for the laws of descent and distribution of the state of Oklahoma to apply to the devolution of estates of deceased Indians of the Five Civilized Tribes, is to repudiate the very doctrine announced in the case of Jefferson v. Fink, supra, and place the people of the state of Oklahoma in the unreasonable position of having three distinct laws of descent and distribution—one for the Creek Tribe of Indians; one for the Seminole Tribe of Indians; and one for the people in general throughout the state. Such a contention is not founded upon reason or supported by the authorities, but it requires the court by an unreasonable rule of construction to detach from the dead corpse of the Arkansas law as contained in chapter 49, Mansfield's Digest, the provisos as contained in section 6 of the Supplemental Creek Treaty of June 30, 1902, and ingraft them on to the laws of Oklahoma without any authority whatever of any legislative act of the Congress or of the state, and by such an illogical rule of construction thereby disinherit the wives and children of the deceased allottees of the various tribes of Indians. It is more in keeping with the purpose of the Congress and sustained by every sound rule of statutory construction to hold that when the Arkansas law of descent and distribution was repealed, the provisos contained therein fell with the statute, and such a construction is in harmony and consistent with every sound rule of statutory construction applicable to the construction of statutes.

Having arrived at this conclusion, the judgment in the case at bar must be re-

versed, and under the agreed statement of facts in the record the plaintiff in error, Josie Pigeon, is entitled to inherit the estate of Robert Pigeon, deceased, to the exclusion of the defendants in error

The conclusions reached in this case are not in conflict with the doctrine announced by this court in the case of Bruner v. Oswald et al., 72 Oklahoma, 178 Pac. 693, for in that case the deceased Creek allottee died March 23, 1902, and the allotment to which the deceased allottee was entitled was made in the name of her heirs on July 9, 1906. Therefore, it was properly held that the descent and distribution of said estate was governed by the law as found in chapter 49 of Mansfield's Digest, as qualified by the provisos of the Creek Treaty of June 30, 1902.

Judgment is therefore entered reversing the judgment of the trial court, and Josie Pigeon is decreed to be the sole and only heir at law of Robert Pigeon, deceased, and entitled to the distribution of the allotment in controversy.

HARRISON, C. J., and MILLER, ELTING, and NICHOLSON, JJ., concur; KANE, PITCHFORD, and JOHNSON, JJ., dissent.